TEACHERS INSURANCE & ANNUITY ASSOCIATION OF AMERICA, Plaintiff,

v.

David L. BUTLER, James L. Grauer, James E. Kassis, and One City Centre Associates, a California Limited Partnership, Defendants.

No. 84 Civ. 3211 (EW).

United States District Court,
S.D. New York.

Jan. 28, 1986.

Fried, Frank, Harris, Shriver & Jacobson, New York City, for plaintiff; Robert E. Gerber, Mary Farrington, of counsel.

Willkie Farr & Gallagher, New York City, for defendants; Francis J. Menton, J. Kelly Strader, of counsel.

OPINION

EDWARD WEINFELD, District Judge.

Plaintiff, Teachers Insurance and Annuity Association of America ("Teachers"), is a New York nonprofit corporation which provides annuities and insurance programs to colleges, independent schools and other educational institutions, and derives income for such programs from various investments, including long-term loans on commercial real estate.

The defendant, One City Centre Associates ("OCCA"), is a California limited partnership which undertook the development and construction of a high rise office building, One City Centre, in Sacramento, California. It has three general partners, David L. Butler, James E. Kassis and James L. Grauer, also named as defendants (collectively "defendants" or "the Butler group").

In connection with the development of the building, OCCA needed temporary or construction financing for the period during which the building was under construc-

tion and upon completion "permanent financing," which would be applied to the repayment of the construction financing. Bank of America made the construction loan.

Teachers, after extended negotiations with representatives of Sonnenblick-Goldman Corp., mortgage bankers and realtors who acted as the defendants' agents, and with Butler and Kassis on behalf of OCCA, issued on September 9, 1982 a Commitment Letter which was accepted by the individual defendants on behalf of OCCA. Under the Commitment Letter, which the parties acknowledge constituted a binding agreement between them, Teachers agreed to lend and OCCA agreed to borrow $20,000,-000 for a thirty-five year term at a fixed interest rate of 14.25% per annum, to be secured by a first deed of trust on the building.[1] The Commitment Letter, among other matters, granted Teachers a contingent interest in the rental returns over the life of the loan, referred to as a "kicker." One provision precluded the defendants from prepayment of the mortgage during the first seventeen years (the "Lock-in Period") and another permitted prepayment during the remainder of the loan upon payment of a premium ("Prepayment Premium") at 6% in the eighteenth year and in reduced amounts thereafter until the expiration date of the loan. These provisions, to be discussed hereafter, are at the heart of this litigation.

In October 1982, Teachers, OCCA and Bank of America, the construction lender, executed a related agreement called a Take-Out Agreement. It provided that Teachers would "take out" (i.e., purchase) Bank of America's construction loan or repay it the sums it advanced for construction of the building and succeed to its rights.

In July 1983, Teachers' counsel sent to OCCA for review and comment the closing documents which Teachers proposed be executed by OCCA at the closing of the loan, including a California Deed of Trust and California Deed of Trust Notes, which in relevant part provided:

> In the event Holder exercises its right to accelerate the maturity date following default by Maker, any tender of payment of the amount necessary to satisfy the entire indebtedness secured hereby made thereafter at any time prior to a foreclosure sale, either by Maker, its successors or assigns or by anyone in behalf of Maker, shall be deemed to constitute evasion of the prepayment privilege and shall be deemed to be voluntary prepayment herein and such prepayment, to the extent permitted by law, shall include the premium required to be paid under the prepayment privilege set forth herein. If such occurrence takes place prior to the eighteenth loan year then the agreed premium due and owing one [sic] the unpaid indebtedness shall be the product of the premium otherwise due under the formula herein for prepayment during the eighteenth loan year multiplied by three.

The parties refer to this provision as the "Default Prepayment Fee Language" and to the second sentence thereof as the "Lock-In Period Default Prepayment Fee Language."

Prior to the time set for the closing on April 30, 1984, Teachers and OCCA, through their respective counsel, had resolved all disagreements with respect to the language of the closing documents except the Default Prepayment Fee Language. On April 30, 1984, Kassis and Grauer (with a power of attorney authorizing them to act for Butler) appeared at the office of the escrow agent the parties had mutually agreed upon and made certain changes in provisions unrelated to the Default Prepayment Fee Language which had been agreed upon by their respective attorneys. However, they also struck the Default Prepayment Fee Language in each Deed of Trust Note and the Deed of Trust before signing the documents. Later that day, OCCA's attorney informed plaintiff's

---

1. Under California law, the deed of trust evidences a security interest in the real property and serves the same purpose as a mortgage on the property under New York law.

attorney that OCCA was unwilling to accept the Teachers loan as long as the documents contained the Default Prepayment Fee Language. Teachers then drew the full amount of a $200,000 letter of credit which previously had been provided by OCCA under the Commitment Letter. Soon thereafter, Teachers commenced this diversity action.[2]

▮ Plaintiff seeks to recover damages upon a claim of breach of contract—that defendant failed to negotiate in good faith the dispute with respect to the Default Prepayment Fee Language and that OCCA's claimed objection thereto was no more than a pretext for its unwillingness to proceed with the transaction as a result of a dramatic decline in interest rates from the date the Commitment Letter was signed to the date of the closing; that OCCA adamantly refused to negotiate the amount of the Default Prepayment Fee and insisted upon its deletion in its entirety—in sum that its position was wholly arbitrary and in bad faith. Plaintiff seeks to recover as damages the sum of $3,991,408, the difference between 14.25%, the rate of interest set forth in the Commitment Letter and 11.89%, the prevailing rate of interest on Teachers' loans during the month after the closing, over the thirty-five year period of the loan, discounted to present value. Plaintiff also seeks to recover $170,000 covering interest over a six-month period following defendants' refusal to close the deal, which period it claims was reasonably required before it could place a new loan, and $22,411 for the fees of its outside counsel retained for the closing.

The defendants reject plaintiff's claim, essentially upon the ground that the Commitment Letter makes no provision for a Default Prepayment Fee payable after Teachers' exercise of a right to accelerate for default during the first seventeen years of the loan. The essence of their position is that although the Commitment Letter contains a detailed provision entitled "prepayment," that provision does not mention anything about Teachers' right to an 18% default prepayment fee. Therefore, according to the defendants, it was plaintiff that breached the contract by insisting on the inclusion of a provision in the closing documents that was not in the Commitment Letter. Defendants counterclaim to recover the $400,000 commitment fee retained by plaintiff and the $25,000 appraisal and engineering inspection fee paid to plaintiff.

## DISCUSSION

After a study of the entire record[3] of the six-day nonjury trial at which plaintiff's representatives and those of the Butler group testified, principally David Butler and James Kassis, who participated in the negotiations that led to the Commitment Letter and in events prior to the closing, and upon an evaluation of the credibility of the witnesses and consideration of the legal contentions advanced by the parties, the Court finds that the plaintiff has sustained its burden of proof upon its claim for breach of contract,[4] and that the defendants have failed to sustain their burden of proof upon their counterclaim. Plaintiff is entitled to judgment in its favor.

Under New York law, a duty of fair dealing and good faith is implied in every contract.[5] As this Court has said: "Where

2. See Teachers Ins. & Annuity Ass'n of America v. Butler, 592 F.Supp. 1097 (S.D.N.Y.1984) (denying defendants' motion to dismiss for lack of in personam jurisdiction; denying defendants' motion to transfer pursuant to 28 U.S.C. § 1404(a); and directing expungement of a lis pendens filed by plaintiff upon condition that defendants post a bond in the sum of $600,000, which together with $400,000 previously received by plaintiff the Court deemed adequate to protect plaintiff's interests).

3. The record includes the deposition testimony of witnesses and numerous documents introduced into evidence by the parties.

4. The Court finds that plaintiff failed to sustain its burden of proof with respect to its claim of fraudulent inducement, raised for the first time in the joint pretrial order and apparently abandoned by plaintiff at trial.

5. See Filner v. Shapiro, 633 F.2d 139, 143 (2d Cir.1980); Contemporary Mission, Inc. v. Famous Music Corp., 557 F.2d 918, 923 n. 8 (2d Cir.1977); Van Gemert v. Boeing Co., 553 F.2d

the parties are under a duty to perform that is definite and certain the courts will enforce a duty of good faith, including good faith negotiation, in order that a party not escape from the obligation he has contracted to perform."[6] Here, defendants signed the Commitment Letter, an agreement they concede was binding on both parties, obligating them to borrow and plaintiff to lend $20,000,000. Obviously the Commitment Letter did not contain, and the parties understood that it did not contain, all the final and definitive terms that were to be incorporated in the closing documents. Both parties were required to negotiate in good faith with respect to the closing documents needed to consummate the transaction. Defendants breached that duty to negotiate in good faith and therefore breached the contract with Teachers.

We start with an uncontested fact—that a prerequisite to the Butler group obtaining a construction or temporary loan to finance the construction of the contemplated office building was a permanent loan that would "take out" the construction loan. Defendants, through their agent Sonnenblick-Goldman, arranged for the permanent financing from Teachers. Even before signing the Commitment Letter they were aware that it was Teachers' policy to adhere to the interest rate set forth in the agreement regardless of what happened to market interest rates and that Teachers expected its borrowers to do the same. The evidence supports a finding, however, that the Butler group, almost from the time the parties obligated themselves under the Commitment Letter, communicated with various lenders and brokers to avoid taking the Teachers loan. Beginning shortly after the Commitment Letter, with its interest rate of 14.25%, was signed, interest rates started to decline and as construction went forward, continued to decline so that when the loan was ready to be closed, financing was available at approximately 12% and without a kicker. Having obtained the permanent loan commitment necessary for construction to begin, defendants took advantage of the nineteen-month period before the scheduled closing to seek a more favorable loan package from other lenders.

Defendants do not deny communicating with other lenders in an attempt to arrange for permanent financing, but they contend that their purpose was to protect themselves against their inability to meet a requirement of the Commitment Letter that the building be 50% pre-leased at the time of closing. Defendants point to the financial difficulties of Attorneys Office Management Inc. ("AOMI"), a tenant to whom the defendants were required to lease a fixed percentage of building space. The evidence establishes that this claim was spurious. The pre-leasing requirement clearly was for the benefit of Teachers alone; a condition which Teachers could, and ultimately did, waive. Defendants began communicating with other lenders over two months before receiving evidence that AOMI had filed a chapter XI proceeding. Moreover, defendants' communications to the other lenders and their testimony at trial belie their professed intention to protect themselves against a decision by Teachers not to proceed with the loan.[7] The defendants' principals, Kassis and But-

---

812, 815 (2d Cir.1977); *Lowell v. Twin Disc, Inc.,* 527 F.2d 767, 770 (2d Cir.1975); *Rowe v. Great Atlantic & Pacific Tea Co.,* 46 N.Y.2d 62, 412 N.Y.S.2d 827, 385 N.E.2d 566 (1978); *Kirke La Shelle Co. v. Paul Armstrong Co.,* 263 N.Y. 79, 188 N.E. 163 (1933); *Wood v. Lucy, Lady-Duff Gordon,* 222 N.Y. 88, 118 N.E. 1082 (1917).

**6.** *Candid Productions, Inc. v. International Skating Union,* 530 F.Supp. 1330, 1334–35 (S.D.N.Y. 1982); *see also Nuvest, S.A. v. Gulf & Western Indus., Inc.,* 649 F.2d 943 (2d Cir.1981); *Sommer v. Hilton Hotels Corp.,* 376 F.Supp. 297 (S.D.N.Y.1974).

**7.** For example, in a letter dated November 29, 1982, Kassis responded to another lender's loan offer: "[T]he rate and term of the loan you are offering is not attractive enough to induce us to change." *See* Plaintiff's Exhibit 12. Kassis admitted on direct examination that at the time he signed the Commitment Letter, he believed OCCA would be able to meet the pre-leasing requirements. *See* Testimony of James Kassis, Tr. at 632–33, 692.

ler, were less than forthright with respect to this and other essential matters; bluntly, in some respects they were evasive and contrived answers to explain factual situations and documentary proof which were contradictory of, and adverse to, their contentions. Defendants' claims must be viewed in the context of their subsequent dealings with Teachers, discussed hereafter, the decline in interest rates, and their acknowledged belief that the loan was not economically favorable to them.

Defendants' actions during the last few months prior to the scheduled closing date conclusively establish that, as the closing drew near, the defendants deliberately intended not to proceed with this loan—at least not on the terms contained in the Commitment Letter. By contrast, Teachers not only took the steps necessary to close the loan, as it was obligated to do under the Commitment Letter, but it offered the defendants alternatives designed to reduce the likelihood of a default.

In July 1983, Teachers sent the draft closing documents to the Butler group for its comments.[8] These documents included the same Default Prepayment Fee Language upon which defendants ultimately based their refusal to close the loan transaction in April 1984. Defendants failed to acknowledge or respond to the request for comments. In January 1984, in connection with a checklist of matters that required attention before the closing, plaintiff's representative reminded the Butler group that Teachers was still waiting for any comments with respect to the draft documents.[9] Again there was no response. In a letter dated February 1, 1984, Teachers' in-house counsel wrote to Kassis that Teachers assumed, in light of defendants' failure to respond with any comments, that the documents were satisfactory and would be deposited in escrow.[10]

On February 7, 1984, ten weeks before the closing, in a telephone conversation with a Teachers representative, Butler expressed his view that in light of OCCA's difficulties in meeting the 50% pre-leasing requirement, defendants did not have to close the loan.[11] The Teachers' representative said that the Commitment Letter was binding and suggested that Butler should seek a legal opinion with respect to the position he was taking. Kassis, a lawyer, testified that when Butler informed him of this conversation with Teachers, Kassis felt the defendants should "screw the two points" (the $400,000 commitment fee) and not proceed with the loan.[12]

A few weeks later, on February 22, 1984, Butler told Sullivan, Teachers representative who had negotiated the Commitment Letter with OCCA, that he assumed Teachers was not interested in closing the deal since AOMI was no longer a tenant.[13] To Butler's surprise and dismay, Sullivan responded that the pre-leasing condition was for Teachers' benefit and could be waived by plaintiff. Defendants subsequently were informed by their own attorneys and by Teachers' counsel specially retained for the purpose of closing the transaction, that under the contract Teachers could waive the pre-leasing condition and insist that the loan be closed despite the absence of AOMI.

After reviewing the leasing information for the One City Centre building sent by Kassis on February 24, 1984, Teachers decided the project was basically sound and informed defendants of its decision to close notwithstanding that the leasing percentage had not been met. In a good faith effort to meet the Butler group's concerns about the rental situation, Teachers offered

---

**8.** *See* Plaintiff's Exhibit 35.

**9.** *See* Plaintiff's Exhibit 56.

**10.** *See* Plaintiff's Exhibit 6. Defendants do not acknowledge having received this letter.

**11.** *See* Deposition Testimony of David Butler, at 209; Testimony of David Butler, Tr. at 938.

**12.** *See* Plaintiff's Exhibit 32; Testimony of James Kassis, Tr. at 819–20.

**13.** *See* Testimony of David Butler, Tr. at 947; Testimony of Daniel Sullivan, Tr. at 71.

the defendants a six-month extension of the commitment to October 31, 1984 to allow them more time to secure additional leases for space in the building.[14] On April 12, 1984, less than three weeks before the closing, Butler requested a reduction of the interest rate from 14.25% to 12% and of the contingent interest (the "kicker") from 40% to 33.3%. Teachers representative refused to reduce the interest rates, but reiterated the offer of a six-month extension, told Butler that OCCA could obtain a second mortgage, and offered the defendants an accrual type loan in which interest payments would be tied directly to the building's operating income, thereby reducing the likelihood of a default on the loan.[15] Throughout its dealings with OCCA, Teachers adhered to its position that its policy was "to live up to the terms and spirit of its agreements and it expects those with whom it deals to do likewise."[16]

Defendants said nothing about any of the provisions of the closing documents until it became apparent that their attempts to convince Teachers not to go forward with the loan or alternatively, to lower the interest rate, would not succeed. Although Butler admitted knowing sometime in February that the closing documents contained the Default Prepayment Fee Language,[17] neither he nor Kassis ever mentioned defendants' objections to the inclusion of this provision in the closing documents in any of their conversations or communications with Teachers. In fact, the Butler group's objections to the Default Prepayment Fee Language were not raised until April 26, 1984—only four days before the closing—in a letter sent to Teachers' counsel.[18]

Defendants insisted that the Default Prepayment Fee Language be deleted in its entirety. They made no counteroffers with respect to the amount of any default pre-

payment fee nor were they willing to negotiate its terms.

The defendants take the position that since the Default Prepayment Fee Language was not contained in the Commitment Letter, Teachers was seeking to change the economic terms of the transaction; that the Butler group's refusal to accede to the provision was consistent with their duty to negotiate in good faith. The evidence supports the conclusion, however, that the defendants seized on the absence of the Default Prepayment Fee Language from the Commitment Letter as a pretext for not going forward with the loan. Aware that Teachers considered the Default Prepayment Fee Language necessary to protect its interests, and having failed to convince Teachers not to close the loan, defendants struck the provision and refused to negotiate despite Teachers' willingness to do so.

It is undisputed that the Commitment Letter signed by Teachers and the Butler group contained a seventeen-year Lock-in and a Prepayment Premium, but did not contain Default Prepayment Fee Language. The evidence at trial establishes that closing documents for commercial real estate loans historically contain provisions necessary to implement the express terms of the commitment letters, but which are not contained in the commitment letters. The parties, pursuant to their duty to negotiate in good faith to close the loan transaction, are expected to negotiate the terms of provisions such as acceleration clauses, default interest rates, lender's remedies and default prepayment fees.

Here, defendants not only had an implied duty of good faith negotiation, but they expressly agreed in the Commitment Letter to abide by all matters pertaining to the due execution of documents that Teachers' attorneys found "reasonably necessary for

---

**14.** *See* Plaintiff's Exhibit 42.

**15.** *See* Testimony of Ronald Bernhard, Tr. at 107–11; Testimony of David Butler, Tr. at 950–58.

**16.** *See* Plaintiff's Exhibit 30.

**17.** *See* Testimony of David Butler, Tr. at 957, 966.

**18.** *See* Plaintiff's Exhibit 44.

the transaction."[19] The Default Prepayment Fee Language included by Teachers in the closing documents was not only "reasonably necessary," it was essential to protect Teachers from a voluntary default by OCCA.

The purpose of such language is to protect a lender against a drop in market interest rates which induces the borrower to default in the early years of the loan, forcing the lender to accelerate the balance, and enabling the borrower to prepay the loan with a second loan obtained at the lower interest rate.[20] There can be no doubt that the loan, if consummated, would have been a highly desirable one to plaintiff, with its prospect of a stream of income over a thirty-five year period at a high interest rate and additional income by way of a kicker. The Default Prepayment Fee Language was intended to implement the Lock-in provision of the loan; without it, the borrowers could circumvent the Lock-in without consequence, depriving Teachers of the benefit of its bargain. Financial lenders in the California market, to protect themselves against such practices, included in their closing documents Default Prepayment Fee clauses at fixed amounts which were not immutable but subject to negotiation. The evidence fully establishes that the inclusion of such clauses was the custom and practice in the California real estate financing market. Indeed, defendants' own expert acknowledged this was so, although he testified some loans were closed without its inclusion.[21] Here, the evidence is that over a period of more than twenty years, Teachers included substantially the same Default Prepayment Fee Language in all of its closing documents to protect itself against a default intended to deprive it of the benefits of the loan. Teachers' inclusion of such language in the closing documents for the OCCA loan is consistent with both Teachers' practice and industry practice.

Even Teachers probably would agree that it would have been more prudent for it to have included the Default Prepayment Fee Language in the September 1982 Commitment Letter. Some lenders include it in their commitment letters and the industry trend during the past few years appears to be towards greater specificity in commitment letters, in part due to a desire to avoid litigation such as this over provisions not contained in commitment letters. But this does not undermine the Court's conclusion that the Butler group breached its duty to negotiate in good faith to close the loan. As discussed above, defendants had the closing documents in their possession for nine months and, despite repeated reminders from Teachers to review the documents, they waited until four days before the closing to object to the Default Prepayment Fee Language. Then, instead of making a counteroffer or engaging in good faith negotiations with respect to the amount of the fee or its terms, defendants arbitrarily refused to negotiate and insisted that it be deleted in its entirety. Nine months after insisting that Teachers delete the Default Prepayment Fee Language from the closing documents, defendants signed closing documents from Aetna Life Insurance Company which provided defendants with more money at a lower interest rate and without a kicker, but which contained a Default Prepayment Fee based on a formula which potentially could result in the imposition of a fee much greater than the 18% fee in Teachers' documents.

In sum, the inescapable conclusion the Court draws from the totality of the evidence is that defendants' refusal to negotiate with respect to the Default Prepayment Fee Language was simply a last-ditch attempt to scuttle the loan agreement they had entered into nineteen months earlier.

---

19. Plaintiff's Exhibit 1, ¶ 11(c).

20. *See* Testimony of Bruce Hyman, Tr. at 231–35; Testimony of Michael McAndrews, Tr. at 568–69; Testimony of Alan Wayte, Tr. at 302; Deposition Testimony of Kevin Starr, at 10–11.

21. Defendants' expert also agreed with plaintiff's witnesses that default prepayment fees are often negotiated by the parties. Testimony of Michael McAndrews, Tr. at 570.

The defendants signed the permanent financing agreement with Teachers to enable themselves to obtain construction financing from Bank of America. Almost immediately thereafter, as interest rates declined, defendants sought alternative financing from other lenders. When they were unable to persuade Teachers to lower the interest rate agreed to in September 1982 and when they realized that Teachers was serious about living up to its commitments, defendants engaged in an eleventh hour comparison of the closing documents to the Commitment Letter to come up with an ostensible reason for not going forward with the loan. Defendants breached the Commitment Letter and are obligated to Teachers for its damages.

### PLAINTIFF'S DAMAGES

■ The basic principle of recovery for breach of contract is that the injured party should be placed in the same position it would have been in had the contract been performed.[22] On the issue of damages, the Commitment Letter expressly provided:

> In the event [defendants] fail to comply with any of the other covenants and conditions herein ... then [Teachers] shall have the right (i) to retain so much of the amount paid hereunder and not previously returned, to receive payment on the Letter of Credit also delivered hereunder, and, in addition, to claim and receive all provable damages, including loss of bargain, sustained by us as a result of such default in excess of such amount retained or received.

Plaintiff is entitled to the difference between the contracted for rate of interest—

14.25%—and the rate of interest at the time of the breach,[23] over the thirty-five-year term of the loan, discounted to present value. At the Court's request, plaintiff calculated its damages based on the interest rates at the time of the breach, 12.25%, rather than 11.89%, the average interest rate on Teachers loans during the month of May 1984. This sum discounted to present value amounted to $3,382,979.[24]

In addition, under the terms of the Commitment Letter, plaintiff is entitled to attorney's fees in the amount of $22,411 for counsel it retained for the closing.[25] The $400,000 commitment fee retained by Teachers when the loan failed to close must be deducted from this amount, to avoid giving Teachers more than the benefit of its bargain. The Court declines to award Teachers $170,000 for the difference between the contracted for rate of 14.25% and the short-term interest rate for a six-month period. Teachers offered no evidence that it took six months to close a replacement loan or that Teachers would not have made the later loan had the OCCA loan closed. Teachers is therefore entitled to judgment in the sum of $3,005,390.

The foregoing shall constitute the Court's findings of fact and conclusions of law. Judgment may be entered accordingly.

So ordered.

---

**22.** *See, e.g., Wallace Steel, Inc. v. Ingersoll-Rand Co.,* 739 F.2d 112, 115 (2d Cir.1984); *Adams v. Lindblad Travel, Inc.,* 730 F.2d 89, 92 (2d Cir. 1984); *Brown v. Lockwood,* 76 A.D.2d 721, 742–43, 432 N.Y.S.2d 186, 201 (2d Dept.1980); *New York Water Serv. Corp. v. City of New York,* 4 A.D.2d 209, 213, 163 N.Y.S.2d 538, 542 (1st Dept. 1957).

**23.** Contract damages are measured at the time of the breach. *See J.M. Rodriguez & Co. v. Moore-McCormack Lines, Inc.,* 32 N.Y.2d 425, 429, 345 N.Y.S.2d 993, 995, 299 N.E.2d 243, 245 (1973); *Simon v. Electrospace Corp.,* 28 N.Y.2d

136, 145, 320 N.Y.S.2d 225, 232, 269 N.E.2d 21, 28 (1971); *Orange & Rockland Utilities, Inc. v. New England Petroleum Corp.,* 60 A.D.2d 233, 235, 400 N.Y.S.2d 79, 81 (1st Dept.1977).

**24.** Neither figure was challenged by defendants nor was any contrary evidence introduced.

**25.** The Commitment Letter provided: "[Defendants] agree to pay all expenses in connection with this transaction including but not limited to those for ... attorney's fees (if outside counsel is engaged by us)." Plaintiff's Exhibit 1, ¶ 3.