**STOUFFER HOTEL COMPANY,**
Plaintiff, Counterdefendant,

v.

**TEACHERS INSURANCE AND ANNUITY ASSOCIATION, etc., et al.,**
Defendants/Counterplaintiffs.

No. 87–1365–CIV–T–17.

United States District Court,
M.D. Florida,
Tampa Division.

March 14, 1990.

On Motion for Reconsideration or Certification March 21, 1990.

Timothy J. Coughlin, Thompson, Hine & Flory, Cleveland, Ohio and Marvin E. Barkin and Richard B. Wilkes, Trenam, Simmons, Kemker, Scharf, Barkin, Frye & O'Neill, Tampa, Fla., for plaintiff/counterdefendant.

Eben G. Crawford, Squire, Sanders & Dempsey, Miami, Fla., Jeffrey L. Wood, Karl L. Rubinstein, Dallas, Tex., and C. Timothy Corcoran, III, Carlton, Fields, Ward, Emmanuel, Smith, Cutler & Kent, Tampa, Fla., for defendants/counterplaintiffs.

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

KOVACHEVICH, District Judge.

This cause is before the Court on the following:

Dkt. 103 Motion for Summary Judgment by Lincoln Defendants

Dkt. 104 Memorandum in support

Dkt. 109 Motion for Summary Judgment by Defendant Teachers Insurance

Dkt. 110 Memorandum in support

Dkt. 116 Request for oral argument by Defendants

Dkt. 135 Opposition to Motion for Summary Judgment of Lincoln Defendants

Dkt. 136 Opposition to Motion for Summary Judgment of Defendant Teachers Insurance

Dkt. 147 Motion to Strike Opposition to Motion for Summary Judgment of Lincoln Defendants

Dkt. 148 Memorandum in support

■ This circuit clearly holds that summary judgment should only be entered when the moving party has sustained its burden of showing the absence of a genuine issue as to any material fact when all the evidence is viewed in the light most favorable to the nonmoving party. *Sweat v. The Miller Brewing Co.,* 708 F.2d 655 (11th Cir.1983). All doubt as to the existence of a genuine issue of material fact must be resolved against the moving party. *Hayden v. First National Bank of Mt. Pleasant,* 595 F.2d 994, 996–7 (5th Cir. 1979), quoting *Gross v. Southern Railroad Co.,* 414 F.2d 292 (5th Cir.1969). Factual disputes preclude summary judgment.

The Supreme Court of the United States held, in *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986),

> In our view the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Id. at 322, 106 S.Ct. at 2552, 91 L.Ed.2d at 273.

The Court also said, "Rule 56(e) therefore requires that nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing there is a genuine issue for trial.'" *Celotex Corp.* at 324, 106 S.Ct. at 2553, 91 L.Ed.2d at 274. The Court is satisfied that factual disputes remain which preclude summary judgment.

FACTS:

1. Lincoln Property Company is a Texas corporation engaged in the business of syndicating limited partnership ventures in real estate.

2. The Partnership is a Florida limited partnership and the owner of the Lincoln Hotel at Urban Centre in Tampa, Florida.

3. No. 522 is a Florida limited partnership and a general partner in the Partnership which owned the Urban Centre.

4. In late 1985 and early 1986 the principals of Lincoln Property Company determined to divest themselves of their hotels. (Mason Deposition, pp. 18–19). In February, 1987, William Hulett, President of Stouffer, was contacted by Ed Mace, President of Lincoln Hotels, to inquire into Stouffer's interest in the purchase of the Urban Centre Hotel in Tampa, Florida. (Hulett Deposition, pp. 13–15).

5. As a result of the discussions between Mace and Thomas Stauffer, Senior Vice President at Stouffer, Mace received a "letter offer" regarding the potential acquisition of the hotel (Plaintiff's Exhibit 5).

6. In response to Stouffer's letter, the Lincoln Partnership drafted a letter response indicating the basis on which they would go forward with the transaction (Mason Deposition, p. 48; Plaintiff's Exhibit 6). According to Tom Mason, of Lincoln, Stouffer's letter of March 11, 1987, and the Partnership's reply on March 13, 1987, "constituted an agreement between Lincoln and Stouffer to go forward and see if [they] could do a deal." (Mason Deposition, pp. 55–56).

7. The first agreement between the parties contained a binding legal commitment in paragraph 4b that:

Seller shall not consult or negotiate with any person, firm, corporation, or organization, including any other hotel or motel company, for the sale and purchase of the Hotel until: (1) sixty days from the date Seller shall have executed this Letter of Intent and returned same to Stouffer, or (2) such earlier date by which Stouffer shall have notified, in writing, the Seller that the Condition to Buyer's Obligation set forth in paragraph 3.a. above cannot be modified.

8. The Partnership had no "problem" with paragraph 4b, and understood that paragraph 4b of the March 11, 1987 letter was a binding legal commitment. (Mason Deposition, pp. 53–54).

9. After the first agreement between Stouffer and the Lincoln Partnership expired by its terms, a second agreement was entered into dated May 21, 1987 (the "Second Agreement"). Mason testified "it represented [Lincoln's] understanding of the purchase and sales transaction that we were working on and had agreed to as to the business terms set forth therein." (Mason Deposition, pp. 75–76).

10. The Second Agreement was drafted by the general counsel for Stouffer after negotiations with Mason and Lincoln's counsel, Richard Hoffman. The changes to a draft of the Second Agreement were instituted at the request of Lincoln's counsel. (Hoffman Deposition, p. 31).

11. The Second Agreement contained a binding legal commitment, commonly known as a "no-shop" provision, in paragraph 4(b) that:

[The Partnership] shall not consult or negotiate with any person, firm, corporation or organization, including any other hotel or motel company, for the sale and purchase of the Hotel until: (i) sixty days from the date the Partnership shall have executed this [Second] Letter of Intent and returned the same to Stouffer, or (ii) such earlier date buy which either [Stouffer] or [the Partnership] shall have notified, in writing, the other party that the first party is withdrawing from further negotiations under this [Second] Letter of Intent. (Plaintiff's Exhibit 9 at p. 4).

The Partnership's understanding of paragraph 4b of the Second Agreement, as being a binding legal commitment, was the same as its understanding under the first agreement.

12. At the insistence of the Partnership's counsel, changes were made in paragraph 4b to make the clause "mutual". (Ball Deposition, p. 106).

13. It was the understanding of James Ball, in house counsel for Stouffer, that it was the intent of the party that signed on behalf of Lincoln to negotiate in good faith under the Second Agreement. (Ball Deposition, pp. 129–131).

14. The Second Agreement set forth the material terms of the transaction, including "price, time, timing, what is going to be acquired, and says that the parties are going to negotiate, in essence, the ancillary terms of the acquisition. (Ball Deposition, p. 130). The Second Agreement states that only "ancillary terms" were left to be negotiated. (Ball Deposition, p. 130). Stouffer agreed to buy the Hotel "if the ancillary terms of the agreement could be negotiated in good faith" and Lincoln agreed to sell the Hotel "if the ancillary terms of the Hotel could be negotiated in good faith." (Ball Deposition, p. 135).

15. Lincoln agreed that the "material terms" of the transactions were contained in the Second Agreement. (Ball Deposition, pp. 142–143; Exhibit 19).

16. Teachers Insurance and Annuity Association of America is a New York nonprofit corporation which provides retirement annuities and insurance programs to colleges, independent schools and other educational institutions. It derives income for such programs from investments, including long-term loans on commercial real estate.

17. In 1985, Teachers made a loan to the Partnership of up to $31 million to provide long-term financing for the Hotel. The loan to the Partnership was for thirty-five years at a fixed rate of 13% per annum plus contingent interest of 9% of the annual gross room revenues over a base amount of $9,576,038.

18. The loan documents provided that the Partnership had no right to prepay the loan during the first seventeen years of its thirty-five year term (the no-prepayment provision). The loan documents also contained a provision prohibiting the Partnership from selling, transferring or assigning the Hotel during the term of the loan (the no-sale provision).

19. In 1986 or early 1987, Teachers, by its Vice President, John Jardine, gave its informal oral consent to Lincoln to sell the Urban Centre Hotel, and agreed to waive its rights under the prepayment provision of its mortgage with Lincoln. (Jardine Deposition, pp. 127–131). At that time no specific buyer was identified.

20. In June, 1987, Lincoln notified Teachers that it had agreed to sell the Hotel to Stouffer for a purchase price of $25,000,-000 and made a "formal request for release of Teachers' first lien mortgage" upon the consummation of the sale. Lincoln also asked Teachers to allow it certain considerations in connection therewith. (Plaintiff's Exhibit 76).

21. Following the June 12 letter (Exhibit 76), John Jardine met with John Somers, a Senior Vice President for Teachers and recommended that Teachers not agree to have Stouffer purchase the Urban Centre Hotel from Lincoln. (Jardine Deposition pp. 157–158).

22. The reason for the recommendation was that Teachers did not have good relations with Stouffer. In 1985, Stouffer Hotel Company asked Teachers to provide permanent financing for a Stouffer hotel in Baltimore, Maryland. Teachers agreed to provide the financing and sent Stouffer a proposed commitment letter. Stouffer demanded numerous changes in the commitment letter. Negotiations continued throughout 1986. In early 1987, Teachers agreed to Stouffer's outstanding demands. Stouffer terminated the negotiations and sued Teachers for the return of its good-faith deposit. Teachers was left with the belief that Stouffer had not negotiated in good faith, and that it backed out of the financing because interest rates had fallen substantially since Teachers issued its com-

mitment, and that Stouffer was not someone Teachers would want to do business with in the future.

23. At the meeting in June, 1987, Somers and Jardine agreed that any issue regarding the prepayment provision in the mortgage was "moot." (Jardine Deposition, p. 78).

24. A few days later, Jardine advised Tom Mason and possibly William Duvall, of Lincoln, that Teachers would not approve the sale to Stouffer because Teachers wanted "very importantly to stay in the transaction." In part, this was because Teachers "felt very strongly about the long term viability of the hotel, and [that] Stouffer's being involved with the hotel would have precluded [Teachers] from recasting the financing." (Jardine Deposition at p. 160).

25. On June 23 and 24, 1987, Jardine met with William Duvall of Lincoln and discussed Teachers "good and amicable relationship with Continental" and "the types of financing Teachers had done with Continental." Jardine Deposition, p. 173–179). Jardine then promised Duvall he would speak to Continental, which he did on June 29, 1987. (Jardine Deposition, p. 166).

26. On July 2, 1987, Jardine spoke to Tom Mason and told him to "respond quickly" to provide information on the Hotel to the Continental Representatives, Pete Sibley and Ken Gaudet. (Jardine Deposition, p. 171). At the same time, on July 2, 1987, Jardine, with the knowledge that "by Wednesday, July 8, Stouffer will be expecting [Lincoln] to sign their contract for closing on July 15," told Mason:

> "that, look, the Stouffer's transaction is not something that is going to happen, and you should be done with it."

(Jardine Deposition, pp. 171–172).

27. On July 2, Lincoln complied with Jardine's demand to "respond quickly" to Continental and sent a large amount of information to Continental. (Plaintiff's Exhibits 11, 13, and 154).

28. On July 2, Tom Mason explained the business deal to Continental in a phone conversation with Mr. Gaudet. (Plaintiff's Exhibit 16). Mason explained the purchase price for the Hotel, and also why an agreement with Continental should contain a mutual indemnity against broker's demands for commissions: Mason said:

> "6. Mutual indemnities against brokers. The deal Ted Gamble worked on never materialized; and the fact that Continental Companies is now the buyer is only incidental since in reality TIAA has exercised a first refusal right to buy the Property."

(Plaintiff's Exhibit 16).

29. After Mason's discussions with Jardine and Continental on July 2, Lincoln continued to negotiate with Stouffer with the understanding that Stouffer was working toward a consummation of the transaction. (Mason Deposition, pp. 125–126). Despite the continuing negotiations, neither Lincoln nor Teachers informed Stouffer of Teachers' actions or Mason's discussions with Continental. Mason understood at that time that "there was at least room for argument" that Lincoln was not complying with the legal commitments Lincoln had made to Stouffer in the Second Letter of Intent. (Mason Deposition, pp. 125–129).

30. Jardine, when he was informed of the continuing negotiations between Lincoln and Stouffer called Lincoln and said:

> "Look, what is going on here. We have told you no and I know you don't believe me half the time when I say no, but believe me, I mean no, and what the heck is going on here. Let's see what the heck is going on."

(Jardine Deposition, pp. 180–181).

31. In mid-July Jardine requested the contracts or agreements between Lincoln and Stouffer. Jardine testified that he requested these contracts because:

> "I was in an uncomfortable, felt like I was in an uncomfortable position. I talked to Continental, and all of a sudden I find out that conversations are continuing ... I was in a situation where I felt I didn't know what was going on, and was—ran the risk of being embarrassed that this transaction was continuing when it should not, and I had told Continental Companies to get in touch with Duvall because there was a transac-

tion—a possible transaction in Tampa, and what, you know, was going on here."

(Jardine Deposition, p. 183).

32. On July 16, 1987, William Duvall, on behalf of Lincoln Property Company, wrote Jardine regarding updates on various matters, including the Hotel. Duvall stated "We are ready to let Stouffer go if you and Somers say the deal will work. We need to firm this up as soon as possible and will be calling for your response." (Plaintiff's Exhibit 82).

33. By letter dated July 16, 1987, Lincoln and Lincoln Property Company No. 522, Ltd. gave written notice to Stouffer that Lincoln was withdrawing from further negotiations in connection with the purchase of the Hotel under the May 21, 1987 letter of intent in which "the material terms of the proposed sale of the Hotel ... are set forth." (Plaintiff's Exhibit 83).

34. On July 23, 1987, Lincoln's Tom Mason called Tom Stauffer, Vice President of Stouffer, to explain the "real reason" for Lincoln's July 16 notice. As Stauffer testified:

> Tom Mason proceeded to tell me he had been out of town for a few days and a number of things had happened. And he assumed I was calling him because of the letter I had received, which I said I had. And he went on to explain that in a nutshell Teachers had decided that for the price of the hotel, the price had been negotiated, they were going to buy the hotel themselves. He went on to explain that Teachers because I think the words of either their charter or some reason they couldn't own the hotel, so they were going to get an organization basically to front for owning the hotel. He mentioned the Continental Company specifically. And that was the reason for the letter and that's where we stood.

(Stauffer Deposition, pp. 176–188; Plaintiff's Exhibit 110).

35. On July 24, 1987, David Jordan, a lawyer that assisted Stouffer in drafting the contracts, called Lincoln's attorney, Richard Hoffman to inquire as to the reasons for the termination of the deal. Mr. Jordan testified as follows:

> I believe the substance of what was said was that I observed to Mr. Hoffman that, "Well, I understood Teachers had upset the apple cart on your deal." And he agreed that, yes, he understood that, when Teachers found out what Lincoln was selling the hotel to Stouffer for, they wanted us to sell it to one of their affiliates—I'm sorry, wanted Lincoln to sell it to one of their affiliates and that indeed he understood they had a deal with one of, I believe, Teachers' affiliates.

(Jordan Deposition, p. 195; Exhibit 72).

Count I—Breach of Contract—Lincoln Defendants

Defendants Lincoln Property Company, Lincoln–Urban Centre Hotel, Ltd., and Lincoln Property Company No. 522, Ltd. argue:

1. Texas law controls issues of nature, validity and interpretation of letter of intent; Florida law controls remedies.

2. Texas law controls issues as to alleged tortious conduct of Defendants.

3. The letter of intent is too vague, uncertain and indefinite to be enforceable.

4. The letter of intent does not comply with the statute of frauds.

5. The liquidated damages provision of the letter of intent precludes other recovery.

6. The letter of intent is not enforceable because it is not supported by consideration.

7. The letter of intent is not enforceable because it lacks mutuality or because any promises by Plaintiff are illusory.

8. Plaintiff's proper measure of damage is reliance, not lost profits or benefit of the bargain.

Plaintiff responds that the material terms of the agreement contained in the Second Letter of Intent are plain and unambiguous. The terms are as follows:

1. A mutual promise to buy and sell the Hotel;

2. For $25 million;

3. With the parties endeavoring to close the transaction as soon as possible, on or about June 30, 1987;

4. The purchase price to be paid in cash with no contingency for financing;

5. Each party was to mutually indemnify the other for potential broker fees;

6. The Partnership was to be responsible for documentary stamps on the sale;

7. The Partnership was to deliver clear title to the Hotel;

8. The Partnership promised not to negotiate with anyone for sixty days or until it gave notice to Stouffer.

Plaintiff argues that the Second Letter of Intent is not an agreement to negotiate, but an agreement setting forth the material terms for the purchase of the Hotel, with ancillary terms to be negotiated at the closing that the parties contemplated would take place on June 30, 1987. Plaintiff relies on *Teachers Insurance and Annuity Association of America v. Butler*, 626 F.Supp. 1229 (S.D.N.Y.1986) and *Teachers Insurance and Annuity Association of America v. Tribune Co.*, 670 F.Supp. 491 (S.D.N.Y.1987).

In the *Teachers* cases cited above, courts have enforced preliminary agreements as "binding agreements" in the following circumstances:

The second and different sort of preliminary binding agreement is one that expresses mutual commitment to a contract on agreed major terms, while recognizing the existence of open terms that remain to be negotiated. Although the existence of open terms generally suggests that binding agreement has not been reached, that is not necessarily so. For the parties can bind themselves to a concededly incomplete agreement ... to negotiate together in good faith in an effort to reach final agreement within the scope which has been settled in the preliminary agreement. To differentiate this sort of preliminary agreement from the first, it might be referred to as a binding preliminary commitment. Its binding obligations are of a different order than those which arise out of the first type ... [which] binds both parties to their ultimate contractual objective in recognition that [the] contract has been reached, despite the anticipation of further formalities. The second type—the binding preliminary commitment—does not commit the parties to their ultimate contractual objective but rather to the obligation to negotiate the open issues in good faith in an attempt to reach the alternate objective within the agreed framework. In the first type, a party may lawfully demand performance of the transaction even if no further steps have been taken following the making of the "preliminary" agreement. In the second type, he may not. What he may demand, however, is that his counter-party negotiate the open terms in good faith toward a final contract incorporating the agreed terms. This obligation does not guarantee that the final contract will be concluded if both parties comport with their obligation, as good faith differences in the negotiation of the open issues may prevent a reaching of final contract. The obligation does, however, bar a party from renouncing the deal, or insisting on conditions that do not conform to the preliminary agreement.

*Teachers Ins. and Annuity Association v. Tribune Co.*, 670 F.Supp at 498.

■ Several factors must be evaluated to determine whether a preliminary commitment should be considered binding. These are: 1) expression of intent to be bound; 2) the presence of open terms; 3) whether there has been partial performance; and 4) the customary form for such transactions.

■ The subject transaction is a complex one involving a large amount of money. It is the type of transaction which usually requires a formal writing to fully express the promises of the parties. The evidence shows that both parties recognized that the Second Letter of Intent contained the material terms of the transaction. The Second Letter of Intent contemplated continuing negotiations as to ancillary terms until a final closing. The Second Letter of Intent explicitly states that the duty not to negoti-

ate with other parties is a binding commitment. The parties continued to negotiate up until the time Defendants obtained a firm commitment from Continental, at which time Defendants formally withdrew from the transaction. Based on the depositions and documents filed with the Court, jury questions remain as to the existence of a binding commitment.

■ Defendants argue that the Second Letter of Intent contains a liquidated damage provision, and Defendants have already tendered payment for legal expenses associated with the transaction.

The subject provision states:

> Seller has requested that Buyer proceed with appropriate legal work, including but not limited to filing of a premerger notification pursuant to the Hart–Scott–Rodino Antitrust Improvements Act, while Seller obtains said Consents. In the event Seller fails to obtain said Consents, Seller shall upon demand reimburse Buyer for its costs and expense of performing said legal work (including both inside and outside counsel).

Plaintiff responds that the above is not a liquidated damage provision. The Court agrees that the scope of the above paragraph is limited, and the subject dispute is far beyond its limits. The Court therefore denies the motion seeking to limit damages to the amount of attorney's fees expended. Since there is no evidence before the Court which establishes the impossibility of computing lost profits, or the impossibility of calculating damages by comparing the value of the deal which was not consummated with any deal Stouffer was able to conclude with the capital not expended in purchasing the Urban Centre, jury questions remain as to the proper measure of computing damages.

Count II—Tortious Interference with Contract—Lincoln Property Company

■ The Lincoln Defendants argue that the evidence shows that all decisions relative to the Second Letter of Intent were made and carried out by legal representatives and/or agents of No. 522 and all decisions by Lincoln Urban Centre were

made by its general partner, No. 522, by and through No. 522's general partners, Pogue and Duvall, or their authorized agents or representatives. The Lincoln Defendants contend that there is no evidence that Lincoln Property Company influenced the decisions of the Urban Center and No. 522, and therefore summary judgment should be granted as to the Property Company. Further, since Lincoln Urban Centre and No. 522 were parties to the Letter of Intent, they cannot be found to have tortiously interfered with the contract as a matter of law. *Ethyl Corp. v. Balter*, 386 So.2d 1220 (Fla. 3rd DCA 1980).

Plaintiff responds that based on testimonial and documentary evidence, there remain genuine issues of fact as to within what capacity various individuals were acting at the time of their acts, and Lincoln Property is a separate entity from Lincoln Urban Centre and No. 522. The Court agrees with Plaintiff, and denies summary judgment as to Count II.

Count III—Tortious Interference with Contract

Count IV—Tortious Interference with a Business Relationship

■ Under Florida law, to establish a cause of action for tortious interference, a party must demonstrate:

1. the existence of an advantageous business relationship under which that party has legal rights;

2. an intentional and unjustified interference with that relationship by the defendant; and

3. damage to the plaintiff as a result of the interference with the business relationship.

*Unistar Corporation v. Child*, 415 So.2d 733, 734 (Fla. 3d DCA 1982). As the Court stated in *Smith v. Ocean State Bank*, 335 So.2d 641, 642 (Fla. 1st DCA 1976):

> [T]ortious interference with a contract and tortious interference with a business relationship are basically the same cause of action. The only material difference appears to be that in one there is a contract and in the other there is only a business relationship.

Plaintiff's causes of action arise from two separate acts by Teachers. One act is the failure to waive the no-sale, no prepayment provisions of its first mortgage. The other act is the inducement to Lincoln to negotiate with Continental without first giving notice to Stouffer or formally withdrawing from negotiation with Stouffer.

The Court finds that as a matter of law Plaintiff has no cause of action arising from the failure to waive the "no sale" and "no prepayment" provisions. *Ethyl Corp. v. Balter*, 386 So.2d 1220 (Fla. 3rd DCA 1980). *Florida Telephone Corporation v. Essig*, 468 So.2d 543 (Fla. 5th DCA 1985). There is no dispute that Teachers' interest in the transaction is in the nature of an investment, or that the loan documents contained the provisions which expressly reserved to Teachers the right to approve the hotel's buyer, and to limit prepayment. The provisions of the loan documents are plain and unambiguous. Summary judgment is granted to Teachers as to this issue.

■ As to the alleged inducement to Lincoln to negotiate with Continental, Teachers claims that discovery has failed to establish any evidence through deposition or documents which supports Stouffer's naked allegation that Teachers demanded that the Partnership negotiate with Continental. In his affidavit, Exhibit A to Dkt. 110, John Jardine, of Teachers, denies any such demand. In deposition at p. 171, Jardine testified that he asked Mason to respond quickly to provide information to Sibley and Gaudet of Continental as to the Hotel. Plaintiff contends that there is a factual dispute as to whether a demand to negotiate took place. The Court is required to draw all inferences in favor of the non-moving party, and denies summary judgment as to this issue. Accordingly, it is

ORDERED that the motion for summary judgment of Lincoln Defendants is denied as to Counts I and II; it is further

ORDERED that the motion for summary judgment of Teachers is *granted* in part and denied in part as to Count III, and *granted* in part and *denied* in part as to Count IV.

The request for oral argument is *denied,* and the motion to strike is *denied.*

DONE and ORDERED.

## ON MOTION FOR RECONSIDERATION OR CERTIFICATION

This cause is before the Court on Plaintiff's motion for reconsideration or certification, the amendment thereto, Defendant Teachers' response, and Lincoln's motion for reconsideration.

RECONSIDERATION:

FACTS:

1. In 1985, Teachers made a loan to the Partnership of up to $31 million to provide long term financing for the Urban Centre Hotel. The loan to the Partnership was for thirty-five years at a fixed rate of 13% per annum plus contingent interest of 9% of the annual gross room revenues over a base amount of $9,576,038.

2. The loan documents provided that the Partnership had no right to prepay the loan during the first seventeen years of its thirty-five year term (the no-prepayment provision). The loan documents also contained a provision prohibiting the Partnership from selling, transferring or assigning the Hotel during the term of the loan (the no-sale provision).

3. The no-sale provision states:

1.08 *Further Sales or Transfers.* Mortgagor acknowledges that the continuing ownership of the secured premises by the Mortgage is of a material nature to the transaction and the making of the loan evidenced by the Note and secured by this Mortgage. Therefore, Mortgagor shall make no sale, transfer, assignment, disposition or further encumbrance or lien of all or any portion of the Premises, and Mortgagor agrees that in the event of any transfer of all or part of the Secured Premises, howsoever evidenced or occasioned, then, at the option of the Mortgagee, the entire unpaid principal balance under the Note, together

with all accrued interest, shall immediately become due and payable.

4. The no-prepayment provision states:

2. *Prepayment.* No privilege is reserved to prepay the loan during the first 204 months following the commencement of amortization hereof ...

3. In 1986 or early 1987, Teachers, by its Vice President, John Jardine, gave its informal oral consent to Lincoln to sell the Urban Centre Hotel, and agreed to waive its rights under the prepayment provision of its mortgage with Lincoln. At that time, no specific buyer was identified.

4. On June 12, 1987, William Duvall of Lincoln Property Company sent a formal request to Teachers. This letter outlines the terms of the proposed transaction with Stouffer. The letter states:

We have negotiated a sales price to Stouffers of $25,000,000; and in light of the projected losses we feel the sale makes sense. In order to consummate the transaction (which could close between June 30 and July 13) we ask the following:

1. Teachers allow us prior to sale to Stouffers to transfer the Hotel to the general partner for the borrower to avoid creating tax recapture to our limited partners. The general partner entity is Lincoln Property Company No. 522. Ltd., whose general partners include Mack Pogue, William C. Duvall, Michael D. Hogan and Joseph W. McCarthy.

2. Teachers accept prepayment without penalty, and provide a release of lien at sale.

3. Teachers accept the payment of $25,000,000 from sale proceeds, and the remaining principal will be paid by Lincoln by payment of $1,000,000 at time of sale and the balance equally over a three (3) year period. We would expect to provide you some collateral support for our payment obligation.

5. Following the June 12 letter, John Jardine met with John Somers, a Senior Vice President for Teachers and recommended that Teachers not agree to have Stouffer purchase the Urban Centre Hotel from Lincoln. (Jardine Deposition, pp. 157–158) At the meeting, Somers and Jardine agreed that any issue regarding the prepayment provision in the mortgage was moot. (Jardine Deposition, p. 158).

6. A week later, Teachers advised the Partnership it would not consent to the sale, waive the no-prepayment provision, or release its first mortgage lien on the Hotel.

DISCUSSION:

■ There is no factual dispute that Lincoln sought certain concessions from Teachers in order to consummate the deal with Stouffer, and that Teachers never agreed to those terms. Without the concessions, the sale of the Urban Centre could not proceed. According to the deposition testimony of John Jardine, Teachers considered the issue of prepayment moot (and therefore never agreed to it) because it would not approve Stouffer as a buyer. Assuming Teachers had no right to approve the buyer, but only to require full payment of the mortgage upon transfer to the unapproved buyer, Teachers still never consented to waive the prepayment provision when the formal request was made. The deposition testimony of John Jardine is not controverted. Whatever else may have transpired, the Court finds nothing in the record which required Teachers to waive the prepayment provision if it did not want to do so. There is no provision in the loan documents which requires that consent not be unreasonably withheld.

Plaintiff says that Teachers did waive the provision, and then withdrew the waiver. The deposition testimony of John Jardine shows that any initial agreement to waive was conditioned upon disclosure of the new owner and Teachers' approval. (Jardine deposition, pp. 130–131). Plaintiff has brought forth nothing to establish that a binding unconditional waiver was granted, or that Teachers could not withdraw it. When the time came for a formal commitment, Teachers refused.

The Court granted summary judgment only as to the failure (i.e. refusal) to waive the prepayment provision of the mortgage, not as to any actions which might be construed as active interference. Those issues are for the jury. Without the waiver of the no-prepayment provision, this transaction could not go forward on the same terms. The reality is that doing business together is consensual, and Teachers, for whatever reason, did not want to do business with Stouffer. Accordingly, the motions for reconsideration are denied.

CERTIFICATION:

The statutory requirements for certification under 28 U.S.C. § 1292(b) are:

(1) an order involving a controlling question of law;

(2) a substantial ground for difference of opinion with respect to that order; and

(3) an immediate appeal would materially advance the ultimate determination of the litigation.

The only issue on which the Court granted summary judgment is that refusal to waive a contract right does not constitute tortious interference. Plaintiff has failed to show that there is a substantial ground for difference of opinion as to this issue.

The Court finds that since this case is set for trial on Friday, March 23, 1990, an immediate appeal would not materially advance the litigation. Accordingly, it is

ORDERED that the motion for reconsideration and certification is *denied*.

DONE and ORDERED.