THE MARK ANDREW OF THE PALM BEACHES, LTD., the Mark Andrew Operating Company, Inc., Green Fields & White Doors, Inc., Flagler Life Care, Inc., Loretta Gardner and Robert Gardner Plaintiffs,

v.

GMAC COMMERCIAL MORTGAGE CORPORATION, Defendant.

No. 01 CIV. 1812(JGK).

United States District Court, S.D. New York.

July 3, 2003.

---

J Joseph Bainton, Andrew H Beatty, Bainton, McCarthy & Siegel, LLC, New York, NY, for The Mark Andrew of the Palm Beaches, Ltd, The Mark Andrew Operating Co, Inc, Green Fields & White Doors, Inc.

Willie E Gary, F Shields McManus, Williams, Parenti, Finney, Lewis, Mc-Manus, Watson & Sperando, Stuart, FL, for The Mark Andrew of the Palm Beaches, Ltd, The Mark Andrew Operating Company, Inc, Flagler Life Care, Inc, Loretta Gardner, Robert C Gardner, Green Fields & White Doors, Inc.

## OPINION AND ORDER

KOELTL, District Judge.

This action seeks to recover damages from the defendant, the GMAC Commercial Mortgage Corporation ("GMAC"), for the alleged failure to fund a loan for the construction of a continuing care retirement community in West Palm Beach, Florida known as The Mark Andrew. The Mark Andrew of the Palm Beaches, Ltd., the Mark Andrew Operating Company, Inc., Green Fields & White Doors, Inc., Flagler Life Care, Inc., Lorretta Gardner and Robert Gardner (collectively "the plaintiffs") have sued the defendant for, among other things, common law fraud and breach of contract for GMAC's alleged failure to live up to its obligations to provide the plaintiffs $9 million in loan funds.

GMAC has moved for summary judgment on all of the plaintiffs' claims, including breach of contract (Count 1); promissory estoppel (Count 2); fraud (Count 4); negligent misrepresentation (Count 5); bad faith and unfair dealing (Count 7); and failure to exercise reasonable care in processing of loan application (Count 8).[1] GMAC argues, among other things, that at

---

1. The plaintiffs originally pleaded two additional causes of action for anticipatory repudiation (Count 3) and duress (Count 6) but they indicated in their responsive papers that they were no longer pursuing those claims. Those claims, therefore, are dismissed with prejudice.

no time was there any contract to fund any loan, because the parties never signed the necessary documents, that GMAC never signed the necessary commitment letter that would have obligated GMAC to loan the plaintiffs money, and that the parties never agreed upon material terms of the proposed loan, before GMAC decided to abandon the final negotiations. GMAC also argues that any claim based on alleged oral guarantees made by GMAC to provide a loan is barred by the statute of frauds applicable to transactions between banks and borrowers. On the other hand, the plaintiffs argue that summary judgment would be inappropriate on any of its claims, because there are material facts in dispute with respect to whether a finalized contract did in fact exist and whether GMAC did agree to finalize a loan. The plaintiffs main contention is that GMAC finalized the loan, and went so far as to send to the plaintiffs loan closing documents, including a promissory note, that were signed and returned to GMAC. The plaintiffs contend that after they signed the closing documents, GMAC simply breached its obligations and refused to loan the agreed upon $9 million.

## I.

The standard for granting summary judgment is well established. Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Gallo v. Prudential Residential Servs. Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir.1994). "The trial court's task at the summary judgment motion stage of the litigation is carefully limited to

discerning whether there are genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." Gallo, 22 F.3d at 1224. The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323, 106 S.Ct. 2548. The substantive law governing the case will identify those facts that are material and "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)); see also Gallo, 22 F.3d at 1223. Summary judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party. See Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir.1994). If the moving party meets its burden, the burden shifts to the nonmoving party to come forward with "specific facts showing that there is a genuine issue for trial." Fed R. Civ. P. 56(e). The nonmoving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible." Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir.

1993); *see also Scotto v. Almenas,* 143 F.3d 105, 114–15 (2d Cir.1998) (collecting cases). Unless otherwise noted, the following facts are undisputed.

In or about 1994 and 1995, Loretta Gardner, a licensed real estate broker with real estate development experience, along with her husband, Dr. Robert Gardner, formed the Flagler Life Care, Inc. corporation. (Deft.'s Rule 56.1 Stmt. ¶ 1; Pls.' Resp. Rule 56.1 Stmt. ¶ 1.) Through this corporation, the Gardners sought to acquire a large number of contiguous parcels of land located on Flagler Drive in West Palm Beach, Florida that was referred to as the "Assemblage." (Deft.'s Rule 56.1 Stmt. ¶ 1; Pls.' Resp. Rule 56.1 Stmt. ¶ 1.) The Gardners intended, after purchasing the land in the Assemblage, to construct a "Ritz–Carlton" quality senior citizen's continuing care retirement community called "The Mark Andrew." (Deft.'s Rule 56.1 Stmt. ¶ 1; Pls.' Resp. Rule 56.1 Stmt. ¶ 1.) The expected cost of the Mark Andrew was anticipated to exceed $100 million. (Deft.'s Rule 56.1 Stmt. ¶ 1; Pls.' Resp. Rule 56.1 Stmt. ¶ 1.) The Mark Andrew was to consist of approximately 150 independent living units, 66 assisted living units and a 54 bed nursing care facility, which included 15 units for the care of Alzheimers patients and common support areas. (Deft.'s Rule 56.1 Stmt. ¶ 3; Pls.' Resp. Rule 56.1 Stmt. ¶ 3.)

As of 1996, the Gardners had purchased most of the 20 contiguous parcels in the Assemblage, and those parcels were all encumbered by substantial mortgages. (Deft.'s Rule 56.1 Stmt. ¶ 6; Pls.' Resp. Rule 56.1 Stmt. ¶ 6.) In or about 1996 and 1997, the Gardners entered into contracts to purchase the two remaining parcels in the Assemblage. (Deft.'s Rule 56.1 Stmt. ¶ 7; Pls.' Resp. Rule 56.1 Stmt. ¶ 7.) In or about 1997, the Gardners sought to locate a lender to provide the funds necessary to complete the purchase of the remaining parcels of the Assemblage and to finance certain pre-sale requirements; one of these lenders was the defendant, GMAC. (Pls.' Rule 56.1 Stmt. ¶ 8; Dep. of Loretta Gardner dated Aug. 1, 2001 attached as exh. H to Declaration of J. Joseph Bainton ("Bainton I Decl.") sworn to Jan. 7, 2003 at 40–41.)

One other lender from whom the plaintiffs sought to obtain loan financing was the First Connecticut Consulting Group ("First Connecticut"), and on or about May 28, 1997, First Connecticut issued a written commitment letter to lend the plaintiffs $7.5 million for, among other things, The Mark Andrew. (Deft.'s Rule 56.1 Stmt. ¶ 16; Pls.' Resp. Rule 56.1 Stmt. ¶ 16.) Ultimately, First Connecticut did not fund the loan, and the plaintiffs subsequently filed suit in the District of Connecticut against First Connecticut and certain related individuals for failure to fund the loan and they sought damages totaling in excess of $50 million. (Deft.'s Rule 56.1 Stmt. ¶ 18; Pls.' Resp. Rule 56.1 Stmt. ¶ 18.) As against the defendant First Connecticut, the action is still pending in the Bankruptcy Court for the District of Connecticut. (Decl. of Steven S. Rand ("Rand I Decl.") dated Dec. 9, 2002 at ¶ 4; Deft.'s Rule 56.1 Stmt. ¶ 19; Pls.' Resp. Rule 56.1 Stmt. ¶ 19.)

By April, 1999, the Gardners were out of capital, and were in default in payment of many of the mortgages on the properties in the Assemblage. (Deft.'s Rule 56.1 Stmt. ¶ 20; Pls.' Resp. Rule 56.1 Stmt. ¶ 20.) Given these circumstances, and the fact that the plaintiffs were seeking to finance a care facility that was traditionally considered a high risk project, the defendant contend that the Gardners were aware that it would be difficult to obtain financing for the construction of The Mark Andrew. (Deft.'s Rule 56.1 Stmt. ¶ 21.)

Dr. Gardner testified in his deposition that he was aware that banks traditionally do not fund projects intended to be nursing home facilities, because those projects do not tend to fit within banks' conventional lending profiles. (Dep. of Robert Gardner dated Aug. 3, 2001 attached as exh. 7 to decl. of Steven Rand dated Dec. 9, 2002 ("Rand II Decl.") at 120.) The plaintiffs contend that the Gardners were confident that after obtaining interim financing, the Gardners would be able to sell units in the Mark Andrew and to obtain additional financing to complete the project. (Pls.' Resp. Rule 56.1 Stmt. ¶ 21; Dep. of Robert Gardner dated Aug. 3, 2001 attached as Exh. I to Bainton I Decl. at 118.)

At this time, the Gardners sought to obtain interim financing to continue their project, in the form of a bridge loan that would be paid off with the proceeds of a subsequent construction loan. (Deft.'s Rule 56.1 Stmt. ¶ 23; Pls.' Resp. Rule 56.1 Stmt. ¶ 23.) The loan that was sought and proposed by the Gardners was to be secured by a mortgage on the Assemblage parcels, and a bond that would guarantee all sums due under the loan. (Deft.'s Rule 56.1 Stmt. ¶ 22; Pls.' Resp. Rule 56.1 Stmt. ¶ 22.)

In or about April 1999, two brokers, assisting the plaintiffs in obtaining the loan they had proposed, approached Jim Rice, who was employed by GMAC, to request a $9 million bridge loan for The Mark Andrew. (Deft.'s Rule 56.1 Stmt. ¶¶ 28–29; Pls.' Resp. Rule 56.1 Stmt. ¶¶ 28–29.) The Gardners proposed that the $9 million loan would be secured by a first mortgage on Assemblage property and a bond guaranteeing payment on the loan. (Deft.'s Rule 56.1 Stmt. ¶ 32; Pls.' Resp. Rule 56.1 Stmt. ¶ 32.)

The plaintiffs contend that in order to avoid prohibitions on the issuance of bonds that guarantee the repayment of borrowed money, their loan proposal was structured to lease the purchased property, and use the lease payments to pay the amounts due to GMAC, with a bond guaranteeing the payments due under the lease. (Pls.' "Issues of Material Fact" ¶ 6.) Under their proposal the plaintiff, The Mark Andrew of the Palm Beaches, Ltd., would be the borrower under the loan and fee owner of the property in the Assemblage; the plaintiff, the Mark Andrew Operating Company, would lease that property, and the rent payments would be equal to or greater than the payments due on the loan to GMAC. The bond was to guarantee payments under the lease. The defendant and the plaintiffs do not disagree about this basic structure. (See Deft.'s Rule 56.1 Stmt. ¶¶ 38–40; Pls.' Resp. Rule 56.1 Stmt. ¶¶ 39–40.) The parties disagree, to some minimal degree, which payments due under the lease were to be guaranteed by the bond. (See id.)

The plaintiffs and the defendant dispute the nature of the conversations between the Gardners and Mr. Rice and the nature of the representations made by Mr. Rice on behalf of GMAC. The defendant contends that Mr. Rice told the Gardners that GMAC would consider their loan application if the bond to be provided was an absolute guarantee of payment of all sums due and that Mr. Rice never represented that GMAC would definitely fund the loan, even if there was a surety bond. (Deft.'s Rule 56.1 Stmt. ¶ 33.) Mr. Rice testified at his deposition that GMAC would be interested in a loan backed by an "absolute guarantee" of payment, which was a loan structure that he was not familiar with, and that he would talk to others at GMAC who could make a decision. (Dep. of James Rice dated Nov. 16, 2001 attached as exh. 13 to Rand II Decl. at 42.) Charles Wilde, an insurance broker acting on behalf of the Gardners and negotiating

with GMAC, testified at his deposition that Mr. Rice never told him that GMAC would definitely fund the loan, and that he has never heard of any conversation in which Mr. Rice made such a representation. (Dep. of Charles Wilde dated Nov. 8, 2001 attached as exh. 20 Rand II Decl. at 40–41.) The plaintiffs contend that Rice, in fact, represented to the Gardners that GMAC would in fact make the loan, if it was structured in the method proposed by the Gardners. (Pls.' "Issues of Material Fact" Stmt. ¶ 8.) Mrs. Gardner testified in her deposition that Mr. Rice told her that GMAC would fund the loan. (Dep. of Loretta Gardner dated Aug. 1, 2001 attached as exh. 6 to Rand II Decl. at 192.)

A business unit of GMAC, Commercial Capital Initiatives ("CCI"), submitted a bid to the Gardners, after which GMAC issued a loan application for the $ 9 million ("the Term Sheet"). (Deft.'s Rule 56.1 Stmt. ¶ 35; Pl.'s Resp. Rule 56.1 Stmt. ¶ 35.) The terms proposed by GMAC were the most favorable of all the loans offered to the Gardners. (Deft.'s Rule 56.1 Stmt. ¶ 36; Pl.'s Resp. Rule 56.1 Stmt. ¶ 36.)

The Term Sheet indicated that GMAC was proposing a $ 9 million loan, for a period of 24 months, and that after the Term Sheet was signed, GMAC would conduct due diligence over an unspecified period of time. (Term Sheet attached as Exh. 32 to Decl. of Steven Rand dated Dec. 9, 2002 (Rand III Decl.)) At the end of the due diligence period, GMAC was to "issue a commitment letter to make the Loan ("Commitment Letter") or decline to issue a Commitment Letter." (*Id.* at 2.) The Term Sheet further provided that the Commitment Letter would be effective for 30 days from the date it was issued and that "[w]hen a Commitment Letter materially conforming to terms and conditions [in the Term Sheet] is issued, the Borrower is obligated to accept the Commitment Let-

ter and close the Loan with GMAC." (*Id.* at 2.)

The Term Sheet also required the Gardners to pay a $90,000 "Good Faith Deposit" to GMAC which would be retained by GMAC in the event certain events occurred, including if a Commitment Letter were issued and not accepted by the Gardners. (*Id.*) The Good Faith Deposit was to be returned if GMAC failed to issue a Commitment Letter in the manner specified by the Term Sheet, and should GMAC issue a Commitment Letter, the deposit would be credited towards the commitment fee of $270,000 which was due when the Commitment Letter was issued. (*Id.* at 3.) The Term Sheet also provided that the Gardners were to pay a non-refundable $5,000 underwriting fee to GMAC. (*Id.*)

The Term Sheet also included various disclaimers. For example, under the title "Committee Approval" the Term Sheet reads, "[T]he issuance of any commitment or any other undertaking or obligation of GMAC to make the Loan is subject to the approval of its loan/credit committee." (*Id.* at 6.) In addition, on the signature page, in bold type, the Term Sheet contained the following language:

> This letter is not a commitment to lend, either expressed or implied, and does not impose any obligation on [GMAC] to issue a commitment or to make the Loan. The terms and conditions outlined above are not all inclusive, but merely reflect the parties' discussions to date, and are subject to change. The issuance of a commitment to make the Loan is subject to full and complete underwriting, diligence, documentation, and loan/credit committee approval.

(*Id.* at 8.) The plaintiffs have based their breach of contract claim, in part, on an alleged breach of the Term Sheet. (Deft.'s Rule 56.1 Stmt. ¶ 37; Pls.' Rule 56.1 Stmt. ¶ 37.)

The parties agree that the Term Sheet left various items open for future negotiations, including, among other things: the events of default; a default interest rate; the terms of the interest rate cap and its assignment; the surety's subrogation rights in the event of payment of the bond; the drafting of an operating lease; details of the requisite underwriting; and the terms of the surety bond. (Deft.'s Rule 56.1 Stmt. ¶ 45; Pls.' Resp. Rule 56.1 Stmt. ¶ 45.) The Term Sheet also required that any bond that was issued be rated at least A+ by Standard & Poor's. (Deft.'s Rule 56.1 Stmt. ¶ 49; Pls.' Resp. Rule 56.1 Stmt. ¶ 49.)

The plaintiffs and the defendant dispute what happened in the course of loan negotiations after the Term Sheet was delivered to the Gardners and signed. The plaintiffs allege that the parties were working under limited time constraints. (Pls.' "Issues of Material Fact" ¶ 9.) The plaintiffs contend that the transaction was to be a fast track closing in which no Commitment Letter was to be issued, notwithstanding the provisions of the Term Sheet. (Pls.' Resp. Rule 56.1 Stmt. ¶ 53.) The plaintiffs contend, also, that the Term Sheet was simply a standard form used by GMAC, and because the transaction was intended to be a fast track closing, some of the Term Sheet's provisions were not applicable. (Pls.' Resp. Rule 56.1 Stmt. ¶ 55.) The defendant contends that GMAC consistently disclosed to the Gardners, both in the Term Sheet and in oral conversations, that any loan would be subject to approval by GMAC's Loan Committee. (Defts.' Rule 56.1 Stmt. ¶¶ 53–54.)

The plaintiffs' contentions concerning the nature of the representations made by GMAC are largely based on the deposition testimony of Mrs. Gardner. According to Mrs. Gardner, GMAC indicated that GMAC would not conduct due diligence on the loan, because it was secured by a bond, and that GMAC would not issue a commitment letter, because the parties were operating under a shortened time frame. (Dep. of Loretta Gardner dated Aug. 1, 2001 at 172.) She also testified that Mr. Rice indicated that various provisions of the Term Sheet were inapplicable to the loan and that the Term Sheet included terms that the parties had not agreed upon. (Id. at 302.) Mrs. Gardner's deposition testimony indicates that she believed that pursuant to a fast track closing procedure, the loan would proceed straight from the issuance of the Term Sheet to closing, skipping all intermediate steps. (Id. at 167–69; see also id. at 263–64.) In addition, the Loan was described as a "fast-track deal" by Marla Berger, who worked for GMAC. (Dep. of Marla Berger dated Nov. 14, 2001 attached to exh. D of Bainton I Decl. at 46.)

The GMAC Policies and Procedures Manual contains a provision that contemplates a closing entitled a "Fast–Track Closing." In this manual a "Fast–Track Closing" is defined as an "[u]rgent closing in which the Underwriter directly negotiates the provisions of the Legal Documents without first getting a signed Commitment from the Borrower." ("GMACCCM Policies and Procedures" attached as exh. 257 to Decl. of J. Joseph Bainton ("Bainton II. Decl.") sworn to Jan. 7, 2003 at § 2.3.06.)

The parties dispute whether, after the Term Sheet was delivered and signed, GMAC actually approved the loan. The defendant contends that it made clear, and plaintiffs acknowledged, that if the loan was approved and GMAC agreed to close the loan, the evidence of such approval would be documented by signed loan documents. (Defts.' Rule 56.1 Stmt. ¶ 57.) Mrs. Gardner acknowledged in her deposition testimony that closing documents

would be prepared. (Gardner Dep. at 168.) Michael Posner and Roger Stanton, the lawyers representing the Gardners in the proposed transaction, also testified in their depositions that any agreement approving the loan would be accompanied by closing documents. (See Dep. of Michael Posner dated Dec. 3, 2001 attached as exh. 12 to Rand II Decl. at 62–63; Dep. of Roger Stanton dated Dec. 4, 2001 attached as exh. 18 to Rand II. Decl. at 79.)

What the parties dispute, however, is whether the documents eventually provided to the plaintiffs constituted documents indicating that GMAC had approved the loan and whether GMAC made representations, either oral or written, that the loan was approved. The plaintiffs' basic contention is that the parties closed the loan, the plaintiffs received Loan Closing documents, faxed the signature pages to GMAC's attorneys and sent the documents back to GMAC and its attorneys, after receiving indications that the loan was approved. (Pls.' Resp. Rule 56.1 Stmt. ¶ 57; Pls.' "Issues of Material Fact" ¶ 21.) The defendant disputes that any loan was actually approved, and contends that any documents forwarded to the plaintiffs were merely draft documents, not documents signifying loan approval. (Deft's. Rule 56.1 Stmt. ¶¶ 71, 73, 106–07.)

On or about June 1, 1999, GMAC's counsel, forwarded draft loan documents along with a letter that read, "enclosed drafts are being distributed simultaneously to all parties and therefore remain subject to review by GMAC." (Deft.'s Rule 56.1 Stmt. ¶ 73; Pls.' Resp. Rule 56.1 Stmt. ¶ 73.) These draft loan documents contained blanks for certain terms, and were unsigned. (Deft.'s Rule 56.1 Stmt. ¶ 73; Pls.' Resp. Rule 56.1 Stmt. ¶ 73.) Mr. Posner acknowledged receiving this letter and recalled reading it. (Deft.'s Rule 56.1 Stmt. ¶ 74; Pls.' Resp. Rule 56.1 Stmt. ¶ 74.)

Dr. and Mrs. Gardner signed the draft loan documents, signing among other things a Promissory Note, a Mortgage and Security Agreement, an Environmental Indemnity Agreement, an Assignment of Licenses Permits and Contracts, a Guaranty of Recourse Obligations of Borrower, a Debt Service Reserve Agreement and an Assignment of Interest Rate Cap Agreement and Security Agreement. (Deft.'s Rule 56.1 Stmt. ¶¶ 75,77; Pls.' Resp. Rule 56.1 Stmt. ¶¶ 75,77.) The plaintiffs contend that the Gardners signed the loan documents at the request of GMAC and with the understanding that their signatures would close the loan. (Posner Dep. attached to Bainton II Decl. at 61–62.) The plaintiffs contend that they returned the documents via overnight courier soon after they received them on June 1, 1999 (Deft.'s Rule 56.1 Stmt. ¶ 78; Pls.' Resp. Rule 56.1 Stmt. ¶ 78.)

GMAC contends that the parties continued to discuss and negotiate material terms of the loan after June 2, 1999. (Deft.'s Rule 56.1 Stmt. ¶ 87.) Deposition testimony of Roger Stanton and Charles Posner indicates that, after the plaintiffs allegedly signed the Loan documents, the parties continued to discuss, negotiate, and dispute, among other things, the total amount of the bond, and whether the bond, originally designed to insure only the payment of lease obligations, would also insure the payment of the potentially very large property taxes on the land in the event of a default by the plaintiffs. (See Stanton Dep. attached to Rand II Decl. at 75–77, 100 (indicating "back and forth" negotiations were occurring between the parties after documents were signed); Posner Dep. attached to Rand II Decl. at 115.) The plaintiffs contend that these disputes concerning the bond, and its amount, were resolved, and that GMAC ultimately accepted the bond as proposed by the plaintiffs. (Pls.' Resp. Rule 56.1

Stmt. ¶¶ 95, 97.) The defendant contends, however, that discussions concerning the bond continued until mid-June, as part of ongoing negotiations, and GMAC did not accept any bond proposal from the plaintiffs, either before the Gardners signed the draft loan documents or after the negotiations proceeded through June. (Deft.'s Rule 56.1 Stmt. ¶¶ 95–97.) The defendant contends that during the second week of June, GMAC's employees, including one member of the GMAC's Loan Committee determined that GMAC would not proceed with a commitment to fund the loan. (Deft.'s Rule 56.1 Stmt. ¶ 104.) Although GMAC admits that it signed a reconciliation sheet for the loan, it contends that it did not sign any loan closing documents and never issued a written loan commitment letter for the loan to be issued. (Deft.'s Rule 56.1 Stmt. ¶ 107.)

The plaintiffs have a decidedly different view of the events surrounding the loan closing documents and the negotiations that followed. Both Mrs. Gardner and Mr. Posner testified in their depositions that notwithstanding the cautionary language in the draft loan documents, GMAC indicated to them that the draft loan documents were the final loan documents, and that the loan was approved. (L. Gardner Dep. attached to Bainton I. Decl. at 175 ("The loan is approved, the loan is done, it's being based on the surety."); Posner Dep. attached to Bainton I. Decl. at 63.) Mrs. Gardner also testified in her deposition that GMAC requested that the loan documents be faxed immediately back to GMAC. (L. Gardner Dep. attached to Bainton I Decl. at 82.) Her testimony indicates that the signing and faxing of documents indicated to her that a "closing" was occurring. (*Id.* at 82–83.) Finally, she testified that the plaintiffs expected, based on the representations made by the defendant, that the money would be wired within a couple of days of signing and sending the loan documents to GMAC. (*Id.* at 106.)

The plaintiffs also rely on various documents and actions by GMAC to support their contention that GMAC approved the loan and only reneged after they received signed documents from the plaintiffs. An internal GMAC document reflecting account activity for the "Mark Andrew Land Assemblage" refers to the loan as "Committee Approved." (*See* Exh. E. dated May 25, 1999 attached to Decl. of J. Joseph Bainton dated Jan. 7, 2003 Bainton III Decl.) Subsequent account statements also refer to the loan as "Committee Approved." (*See* Exh. F dated June 29, 1999 attached to Bainton III Decl.; Exh. G dated July 15, 1999 attached to Bainton III Decl.) In addition, records from GMAC's "Closing Department" that provide a five day forecast regarding future disbursements indicated that $9,000,000 was to be paid out on June 3, 1999. (*See* Exh. H attached to Bainton III Decl.)

Finally, the plaintiffs contend that because GMAC confirmed to various creditors of the plaintiffs that the loan would be approved, GMAC did agree to fund the loan. (*See, e.g.,* Dep. of Catherine Mayer dated Dec. 7, 2001 attached as exh. L to Bainton I Decl. at 58–63; Dep. of Jerry Aron attached as exh. A dated Aug. 15, 2001 attached as exh. A to Bainton I Decl. at 14–15.)

The documents allegedly signed by the plaintiffs and sent to GMAC were not produced in discovery. (Pls.' "Issues of Material Fact" ¶ 38.) The plaintiffs contend that GMAC received and signed the draft documents. The defendant contends that it never received the signed documents and never agreed to fund the loan.

Ultimately, the plaintiffs did not receive any funds from the defendant. The plaintiffs seek damages based on claims of,

among other things, breach of contract, promissory estoppel, and fraud.

## II.

A threshold issue in the case is the determination of which state's law applies to the claims raised by the plaintiffs. In this case, where jurisdiction is based on diversity of citizenship, a federal court applies the conflict of law principles of the forum state. *See Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496–97, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). In *Brink's Ltd. v. South African Airways,* 93 F.3d 1022 (2d Cir.1996), the Court of Appeals for the Second Circuit explained the approach used by New York courts for resolving choice of law conflicts:

> In contract cases, New York courts now a apply a "center of gravity" or "grouping of contacts" approach. Under this approach, courts may consider a spectrum of significant contacts, including the place of contracting, the places of negotiation and performance, the location of the subject matter, and the domicile or place of the business of the contracting parties. New York courts may also consider public policy "where the policies underlying conflicting laws in a contract dispute are readily identifiable and reflect strong governmental interests." The traditional choice of law factors, the places of contracting and performance, are given the heaviest weight in this in this analysis.

*Id.* at 1030–31 (citations omitted); *see also APC Commodity Corp. v. Ram Dis Ticaret A.S.,* 965 F.Supp. 461, 467 (S.D.N.Y. 1997).

With respect to the contract related causes of action, it is clear that in this case Florida has the most significant contacts because the plaintiffs are residents of the state of Florida, and the funding sought by the plaintiffs was negotiated, in part, in Florida and the loan funding was sought for the development of property located in Florida. The loan was to be secured by a mortgage on property in Florida and the only loan documents, other than the Term Sheet that all parties agree were signed, were signed by the Gardners in Florida. Moreover, many of documents related to the proposed loan and part of the closing documents, including the Promissory Note, contemplated the application of Florida law. (*See, e.g.,* Promissory Note attached as Exh. 42 to Rand III Decl. at § 8.07 (noting that promissory note is to be interpreted pursuant to laws of state where real property encumbered by the loan is located).) A New York Court would apply Florida law under these circumstances to the contract based causes of action. *Cf. Madison Realty, Inc. v. Neiss,* 253 A.D.2d 482, 676 N.Y.S.2d 672, 673–74 (1998).

With respect to the tort claims, under New York law, "the relevant analytical approach to choice of law in tort actions is the 'interest analysis.'" *Lazard Freres & Co. v. Protective Life Ins. Co.,* 108 F.3d 1531, 1539 n. 5 (2d Cir.1997) (quotations omitted). Under the interest analysis, "'the law of the jurisdiction having the greatest interest in the litigation will be applied.'" *Id.* (quoting *Schultz v. Boy Scouts,* 65 N.Y.2d 189, 491 N.Y.S.2d 90, 480 N.E.2d 679, 684 (1985)).

In weighing the interests that two jurisdictions may have in the application of their law to a particular tort cause of action, the New York choice of law rules distinguish between "conduct regulating" and "loss allocating" rules. *Lee v. Bankers Trust Co.,* 166 F.3d 540, 545 (2d Cir. 1999). "If conduct regulating rules are in conflict, New York law usually applies the law of the place of the tort ('*lex loci delicti*')." *Id.* "However, if loss allocating

rules conflict, the choice of law analysis is governed by the so-called *Neumeier* rules" articulated in *Neumeier v. Kuehner*, 31 N.Y.2d 121, 335 N.Y.S.2d 64, 286 N.E.2d 454 (1972). *Lee*, 166 F.3d 540.

■ There are three tort causes of action alleged in this case: fraud, negligent misrepresentation, and failure to exercise due care, otherwise known as negligence. The issues relating to each of these torts which concern the availability of these claims are based on conduct regulating rules rather than loss allocating rules, and therefore New York courts have usually applied the law of the place of the tort. *See Emjayco v. Morgan Stanley & Co.*, No. 95 Civ. 8546(DLC), 1996 WL 452266, at *4 (S.D.N.Y. Aug.8, 1996); *see also La Luna Enterp., Inc. v. CBS Corp.*, 74 F.Supp.2d 384, 389 (S.D.N.Y.1999) (noting fraud rules are conduct regulating); *Duffy v. United States*, 49 F.Supp.2d 658, 659–60 (S.D.N.Y.1999) (noting negligence rules are conduct regulating); *Geneva Pharm. Tech. Corp. v. Barr Labs.*, 201 F.Supp.2d 236, 287 n. 32 (S.D.N.Y.2002) (noting negligent misrepresentation rules are conduct regulating). The place of the tort is usually the place where the alleged injury is inflicted, rather than where the actions causing the injury originated. *See La Luna*, 74 F.Supp.2d at 389; *Emjayco*, 1996 WL 452266, at *4.

In this case, the plaintiffs' causes of action based in tort, including the claims for fraud, negligent misrepresentation, and failure to exercise due care in processing loan application, are all to be interpreted pursuant to Florida law. Florida has the greatest interest in those claims because the tort claims arise from injuries suffered by the plaintiffs in Florida, and from the course of dealing and conduct regarding the funding of a proposed development of property that is located in Florida and because the alleged misrepresentations and fraudulent conduct was directed towards individuals and entities that are citizens of Florida.[2]

### III.

■ The defendant has moved for summary judgment on the plaintiffs' claim for breach of contract. "Under Florida law, the elements of a breach of contract action are (1) a valid contract; (2) a material breach; and (3) damages." *Bland v. Freightliner, LLC*, 206 F.Supp.2d 1202, 1210 (M.D.Fl.2002).

As made clear at oral argument, the plaintiffs base their breach of contract claim on an alleged breach of the Term Sheet. In addition, the plaintiffs base their breach of contract claim on an alleged breach of an alleged agreement between the plaintiffs and GMAC that GMAC would fund a $ 9 million loan, an agreement allegedly reflected in the closing documents.

■ To the extent that the plaintiffs base their claim for breach of contract on a breach of the Term Sheet, the defendant is entitled to summary judgment, because the Term Sheet did not create any binding contractual obligation upon GMAC. The Term Sheet stated, in clear, bold and unequivocal language that the Term Sheet was not a commitment to lend and that it did not "impose any obligation on [GMAC] to issue a commitment or to make the Loan." (Term Sheet at 8.) This language creates a clear waiver of contractual liability on the part of GMAC. Given the clear language of the waiver, the plaintiffs cannot recover damages from the defendant

---

**2.** The plaintiffs argue that Florida law should be applied to all claims and have briefed only Florida law. Even accepting the plaintiffs' proposition that Florida law should be applied, all of the claims must be dismissed.

for the failure to fund a $ 9 million loan on the basis of a breach of the Term Sheet, because the Term Sheet did not create a contract between the parties. In addition, the Term Sheet left out several material terms, yet to be negotiated, including various conditions related to the surety bond, the default interest rate, and the terms of default, and the absence of such material terms indicates an enforceable loan contract was not present. *See Forest Creek Dev. Co. v. Liberty Savings & Loan Assoc.*, 531 So.2d 356, 357 (Fla.Dist.Ct.App. 1988); *Univ. Creek Assoc. II, Ltd. v. Boston Am. Fin. Group, Inc.*, 100 F.Supp.2d 1345, 1349–50 (S.D.Fl.2000).

█ The defendant is also entitled to summary judgment on the plaintiffs' breach of contract claim to the extent that this claim is based on a contract between the parties that was allegedly created after the plaintiffs signed draft closing documents on June 2, 1999. The plaintiffs' basic contention is that the parties formed a contract to have GMAC provide the plaintiffs with a $9 million loan, and the evidence of that contract, or the contract itself, were the closing documents that were signed by the Gardners, sent to GMAC and signed by GMAC. Viewing the facts in the light most favorable to the plaintiffs, neither the oral agreement to fund the loan, evidenced by the signed closing documents, nor the signed closing documents themselves create ·enforceable contracts.

To the extent that the plaintiffs' claim is based on the enforcement of an oral contract between the plaintiffs and GMAC to fund the loan, it is unenforceable. The plaintiffs have alleged repeatedly, throughout their papers and in their responsive Rule 56.1 Statement, that GMAC representatives indicated to the Gardners and others, including the plaintiffs' creditors, that the loan was to be funded, that the

draft documents sent to the plaintiffs were the final closing documents, and that the loan would be funded within a matter of days. Even if these representations are true, the fact there was an oral agreement between GMAC and the plaintiffs to fund a $ 9 million loan, pursuant to which the closing documents were being prepared, would not establish a binding contract. Any oral agreement or oral contract between the parties is not enforceable under Florida law because it does not satisfy the statute of frauds applicable to credit agreements.

█ Under Florida law, a credit agreement is defined as "an agreement to lend or forbear repayment of money, goods or things in action, to otherwise extend credit, or to make any other financial accommodation." Fla. Stat § 687.0304(1). The Florida Statute of Frauds applicable to credit agreements provides, in relevant part,

> CREDIT AGREEMENTS TO BE IN WRITING—A debtor may not maintain an action on a credit agreement unless the agreement is in writing, expresses consideration, sets forth the relevant terms and conditions, and is signed by the creditor and the debtor.

Fla. Stat. § 687.0304(2). The plain meaning of this provision prohibits parties from recovering on claims "which are based, according to the allegations and proof, on an oral promise to extend credit." *Puff 'N Stuff of Winter Park, Inc. v. Bell*, 683 So.2d 1176, 1177 (Fla.Dist.Ct.App.1996) (en banc).

In this case, the plaintiffs and GMAC were negotiating a credit agreement, because the plaintiffs sought a loan of $ 9 million from GMAC. In order for any agreement regarding such a loan between the parties to be enforceable, it would have had to have been in writing. Absent such a written agreement for GMAC to lend the

$9 million sought, no agreement to lend is enforceable. To the extent that the plaintiffs base their breach of contract claim on an oral agreement or oral representations made by GMAC and its employees to provide credit, their claim must, as a matter of law, be dismissed because that agreement was not in writing. *See Univ. Creek Assocs.*, 100 F.Supp.2d at 1351; *In re Vickers*, 275 B.R. 401, 406 (Bankr.M.D.Fla. 2001).

However, the plaintiffs have alleged that there was a written contract between the parties, in the form of the loan closing documents signed by the plaintiffs, that satisfies the Statute of Frauds.[3] The plaintiffs point to deposition testimony and various internal GMAC documents that indicate that the loan was approved, and argue that the only conclusion to be drawn from this evidence is that GMAC signed the closing documents. Summary judgment dismissing the plaintiffs' claim for breach of contract is still appropriate, because even if GMAC signed the closing documents, none of those documents was an enforceable contract under which the plaintiffs may maintain a claim for breach of contract. The plaintiffs have pointed to no document among the loan documents that was an express commit-

ment by GMAC to loan $9 million to the plaintiffs. Indeed, the plaintiffs have stressed that the loan approval process was on a "fast track" that dispensed with the normal procedure of a commitment letter.

None of the documents identified as the loan closing documents purports to contain any promise or obligation undertaken by GMAC to lend the money to the plaintiffs. The loan closing documents included a Promissory Note, a Mortgage and Security Agreement, an Environmental Indemnity Agreement, an Assignment of License Permits and Contracts, a Guaranty of Recourse Obligations of Borrower, a Debt Service Reserve Agreement and an Assignment of Interest Rate Cap Agreement and Security Agreement. The Promissory Note contains only a promise on the part of the Mark Andrew of the Palm Beaches Ltd. to repay a loan of $ 9 million, but does not contain a promise from GMAC to make a loan of $ 9 million, and the document simply recites the obligations imposed upon The Mark Andrew, including things such as late charges, default terms, and interest rates. (*See* Promissory Note attached as Exh. 42 to Rand III Decl.) The Mortgage and Security Agreement outlines further obligations imposed upon the

---

**3.** The defendant GMAC argues that it never received the signed loan closing documents, and in any event, that it never signed such documents, even if they were received. The plaintiffs have argued that the documents were signed but not returned to them and the plaintiffs find alleged significance in the fact that the original documents they allegedly signed and returned to GMAC lawyers were never produced in discovery. In connection with its reply papers, GMAC submitted an affidavit of its attorney that recounts his recollections of how and when he sent documents to the plaintiffs and whether GMAC did, in fact, approve the loan to the plaintiffs or sign the loan closing documents. The plaintiffs have moved to strike that affidavit, arguing among other things, that the statements in the

affidavit are inconsistent with the attorney's deposition testimony. For the purposes of the defendant's motion for summary judgment the facts are evaluated in the light most favorable to the plaintiffs, and even after considering the documents, deposition testimony provided by both sides, as well as the lawyer's affidavit, the Court would presume that the plaintiffs did in fact send signed loan documents to GMAC and that GMAC also signed the documents and approved the loan, in determining whether to grant the defendant's motion. Consequently, the plaintiffs' motion to strike is denied as moot, because whether or not the affidavit is considered by the Court, the disposition of the defendant's motion is not affected.

plaintiffs in connection with the complex lease financing arrangement contemplated as part of the loan transaction. It creates no obligation on the part of GMAC to fund the loan. (*See* Mortgage and Security Agreement attached as Exh. 43 to Rand III Decl.) The other closing documents, including the Environmental Indemnity Agreement, the Assignment of Licenses Permits and Contracts, the Guaranty of Recourse Obligations of Borrower, the Debt Service Reserve Agreement, and the Assignment of Interest Rate Cap Agreement also do not contain any obligation, promise, or undertaking by GMAC to fund any loan. (*See* Exhs. 34, 40, 44, 45, 46, 48 attached to Rand III Decl.) The plaintiffs have not pointed out any term in any written agreement that can be considered to be a contractual obligation or promise to fund any loan. Indeed, the only documents that the parties have pointed to that GMAC was to sign as part of the closing documents were the "Assignment of Interest Rate Cap Agreement and Security Agreement" and the "Debt Service Reserve Agreement." The Assignment provided additional security for the loan, and the Debt Service Agreement also provided for additional security for the loan, in particular, a further deposit by the borrower into an escrow account. Significantly, the amount of that deposit is left blank in the document signed by Ms. Gardner. (Exh. 41 attached to Rand III Decl.) In any event, neither of these documents—the only documents to be signed by GMAC—were commitments by GMAC to loan the money to the plaintiffs. As such, no contract was formed by any of the agreements because none of them contained the written commitment to loan money to the plaintiffs and it is clear that no such money was in fact loaned to the plaintiffs. *See In re Vickers*, 275 B.R. at 406; *see also Fin. Fed. Savings & Loan Assoc. v. Cont'l En-terp.*, 338 So.2d 907, 908 (Fla.Dist.Ct.App. 1976) (per curiam).

The plaintiffs attempt to avoid summary judgment by pointing out in their papers various facts which they contend are in dispute—including whether the closing documents were actually signed by GMAC, whether the parties agreed on a bond amount, whether GMAC told others, including the plaintiffs, that the loan was approved, and whether the GMAC's internal documents indicate that it made efforts to disburse the $ 9 million. Even when these facts are viewed in the light most favorable to the non-moving parties, which the Court must do for the purposes of a motion for summary judgment, those disputed facts do not provide a basis for denying the defendant's motion with respect to the breach of contract claim, because the plaintiffs' have not identified an enforceable written contract pursuant to which GMAC was obligated to fund the loan and whose breach might entitle the plaintiffs to damages. The facts that the plaintiffs point out are disputed do not overcome the fundamental absence of such an enforceable agreement. For example, even if GMAC had agreed to engage in a fast track closing, the absence of any written contract or agreement indicating a loan would be funded prevents a breach of contract claim from going forward. As explained above, any oral agreement for the funding of a loan is not enforceable under Florida law, notwithstanding the numerous statements made by Mr. Rice and other GMAC employees to the Gardners indicating that the loan would be funded. In addition, none of the documents identified as the signed loan closing documents imposed any obligation on the defendant, and none of those documents can be considered to be a contract between the parties. Consequently, the defendant's motion for summary judgment on the breach of contract claim is granted.

### IV.

The defendant has also moved for summary judgment on the plaintiffs' claim for promissory estoppel. The plaintiffs allege, in effect, that GMAC made various promises, during the course of the negotiations, that it was committed to funding a loan of $ 9 million, upon which the plaintiffs relied to their detriment. The plaintiffs claim for promissory estoppel is identical to the claim for breach of contract, because it is based on oral representations that allegedly indicated the presence of an oral contract, and that breach of contract claim is barred by Florida's Statute of Frauds. Florida law prohibits a party from recovering through a claim of promissory estoppel what they are otherwise prohibited from recovering by the Statute of Frauds. *See Shore Holdings, Inc. v. Seagate Beach Quarters, Inc.,* 842 So.2d 1010, 1011–12 (Fla.App.2003); *Coral Way Properties, Ltd. v. Roses,* 565 So.2d 372, 373–74 (Fla.Dist.Ct.App.1990) (per curiam). Because the statute of frauds bars the plaintiffs from enforcing an oral contract, they are also barred from raising a promissory estoppel claim on the basis of those oral representations. Consequently, the defendant's motion for summary judgment on the plaintiffs' claim for promissory estoppel is granted.

### V.

The defendant has also moved for summary judgment on the plaintiffs' claims for fraud and negligent misrepresentation. Both of these claims are also based on alleged oral representations that GMAC made during the course of negotiations and in connection with alleged promises to fund a loan to the plaintiffs. The plaintiffs' allegations with respect to these two claims are identical to the allegations that form the basis of the plaintiffs' breach of contract claim that seeks to enforce an alleged oral agreement. Because the Statute of Frauds prohibits the plaintiffs from enforcing this alleged oral contract, the plaintiffs are also prohibited from recovering on tort claims, including claims for fraud and negligent misrepresentation, that seek damages based on the same conduct and representations that are merely derivative of their claim for breach of an oral contract. *See Canell v. Arcola Housing Corp.,* 65 So.2d 849, 851 (Fla.1953) (noting that the statute of frauds also bars action seeking indirectly to enforce oral contracts, including actions for fraud and deceit, "even though the defendant at the time of making of the oral contract may have had no intention of performing it." (quotations omitted)); *Conner, I, Inc. v. Walt Disney Co.,* 827 So.2d 318, 318 (Fla. Dist.Ct.App.2002) (dismissing negligent misrepresentation claim where oral contract was unenforceable); *Broward Nat'l Bank of Fort Lauderdale v. Bethel,* 341 So.2d 1012, 1013 (Fla.App.1977) (same); *Puff 'N Stuff,* 683 So.2d at 1177 (dismissing fraudulent inducement claim where oral contract was unenforceable: "The appellants' contention that an oral promise to loan money can be termed 'fraud in the inducement,' thereby evading the clear intent of the statutory prohibition, was recognized by the trial judge as mere semantics.") (footnote omitted).

Moreover, under Florida law, "no cause of action for fraud exists concurrent with a breach of contract claim unless there is damage due to fraud that is separate from the damages resulting from any substantial contractual breach." *Argonaut Dev. Group, Inc. v. SWH Funding Corp.,* 150 F.Supp.2d 1357, 1363 (S.D.Fl.2001). Consequently, if a party has alleged claims for breach of contract, the party may not also alleged causes of action in tort, based on negligent or intentional acts, unless those claims are based on acts "that are

independent from acts that breach the contract." *Id.* In this case, the acts that form the basis of the fraud and negligent misrepresentation claims are the same acts that form the basis of the claims for breach of contract, and therefore must be dismissed. *Id.*

Therefore, the defendant's motion for summary judgment on the plaintiffs' claims for fraud and negligent misrepresentation is granted.

## VI.

 The defendant has also moved for summary judgment on the plaintiffs' claim for bad faith and unfair dealing. The plaintiffs argue that when they signed the Term Sheet, and thereby agreed to pay certain fees and deposits, GMAC was from that point forward obligated to negotiate in good faith towards a resolution of the proposed loan agreement, without imposing conditions that did not conform materially with the Term Sheet. The plaintiffs have alleged that GMAC acted in bad faith and engaged in unfair dealing, in violation of the terms of the Term Sheet, by, among other things, demanding that the plaintiffs provide a surety bond in an unlimited amount rather than simply a bond guaranteeing payments due under the proposed lease, and by requiring that the plaintiffs formally release GMAC from liability before refunding the remaining portion of the good faith deposit, and for failing to forward the Gardners' loan proposal to the GMAC loan committee.

The plaintiffs rely on Judge Leval's decision in *Teachers Ins. & Annuity Assoc. of Am. v. Tribune Co.*, 670 F.Supp. 491, 497 (S.D.N.Y.1987) for the proposition that some preliminary binding agreements create the obligation to negotiate in good faith even though some material terms are omitted, and even though the preliminary agreement itself could not be a final bind-

ing agreement with respect to the ultimate object being negotiated. As to this kind of preliminary agreement, the obligation created bars "a party from renouncing the deal, abandoning the negotiations, or insisting on conditions that do not conform to the preliminary agreement." *Id.* at 498. Judge Leval stressed that the determinative issue was whether the parties intended to be bound at the time of the preliminary agreement and manifested to each other that such an understanding was reached. *Id.* at 499. Judge Leval noted that:

> There is a strong presumption against finding binding obligations in agreements which include open terms, call for future approvals and expressly anticipate future preparation and execution of contract documents. Nonetheless, if that is what the parties intended, courts should not frustrate their achieving that objective or disappoint legitimately bargained contract expectations.

*Id.* Judge Leval stressed that a party not intending to be bound even to a preliminary agreement that required negotiations in good faith could protect itself by not accepting language such as "firm agreement" or "binding agreement." *Id.* In *Teachers*, applying New York law, Judge Leval did find a binding commitment to negotiate in good faith based on an exchange of letters that contained expressed language of commitment and the terminology of a binding contract.

The plaintiffs argue that *Teachers* is also the law in Florida and point to *Stouffer Hotel Co. v. Teachers Ins. & Annuity Assoc.*, 737 F.Supp. 1553, 1559 (M.D.Fla. 1990). *Stouffer* was actually decided under the law of Texas although it did apply Judge Leval's opinion in *Teachers*. Assuming that Florida would also follow *Teachers*, as the plaintiffs urge, the documents make clear that there was no bind-

ing preliminary agreement in this case. The parties never entered into a commitment letter; there was only a Term Sheet; and that Term Sheet made it clear it did not establish a binding preliminary agreement.

The duty of good faith and fair dealing does not exist where there has been no preliminary agreement reached or where there is no contract between the parties. *See Cavallaro v. Stratford Homes, Inc.,* 784 So.2d 619, 621 (Fla.Dist. Ct.App.2001). In determining whether a preliminary commitment should be considered binding, the court must determine whether there was some expression of an intent to be bound. *See Stouffer Hotel,* 737 F.Supp. at 1559.

In this case, the Term Sheet, as a matter of law, did not create a preliminary agreement, and therefore, did not give rise to a duty of good faith and fair dealing for GMAC. The Term Sheet began with the statement that GMAC "is pleased to consider your request for financing ... on the terms and conditions outlined below." The disclaimer in the Term Sheet stated clearly that "[t]his letter is not a commitment to lend, either express or implied, and does not impose any obligation on GMACCM to issue a commitment or to make the loan." (Term Sheet at 8.) The disclaimer further stated that the Term Sheet was intended only to "reflect the parties discussions to date and are subject to change." (*Id.*) The disclaimer also said that the "issuance of a commitment to make the Loan is subject to full and complete underwriting, diligence, documentation, and loan/credit committee approval." (*Id.*) This language reflects the fact that there was no commitment that GMAC would fund any loan or even issue any commitment letter and that there was no agreement to that effect. The Term Sheet was neither a preliminary agreement to fund any loan nor to enter into a commitment letter, which would have given rise to the duties that the plaintiffs contend were breached. There was no preliminary agreement requiring the parties to negotiate towards a loan that would be funded. The Commitment Letter may have constituted such a letter and may have imposed such a duty, but that letter was never issued. Under the express disclaimer contained in the Term Sheet, GMAC was under no obligation to negotiate in good faith, to have reasonable demands regarding the surety bond, or to give the loan to the GMAC loan committee. Absent such a duty, the defendant's motion for summary judgment is granted, with respect to the plaintiffs' claim for breach of the duty of good faith and fair dealing.

## VII.

The defendant has also moved for summary judgment on the plaintiffs' claim for failure to exercise reasonable care in the processing of a loan application. The defendant has argued that there is no common law duty created between a potential borrower and a lender in loan transactions. The plaintiffs have not responded to this argument, and have not come forward with any authority indicating that such a duty does in fact exist. Such a duty would be inconsistent with the consistent Florida cases that require that the lender be bound by a written agreement before being under a duty to lend. Therefore, this Count should be dismissed.

In addition, as noted above, claims for negligence can only be maintained under Florida law if those claims are based on acts that are separate from the acts alleged to be the basis of a claim for breach of contract. *See Argonaut Dev.,* 150 F.Supp.2d at 1363. The plaintiffs' claim for negligence in connection with the processing of the loan application is based

on the same facts as their breach of contract claim, because the plaintiffs have alleged that the defendant imposed unfair conditions during the course of negotiations and that the defendant breached its duty by failing to fund the loan. (*See* Second Am. Compl. ¶¶ 96, 102.) The plaintiffs have simply attempted to repackage their breach of contract allegations, which have consistently alleged that the defendant did not act appropriately during the course of the transaction and thereby breached various obligations owed to the plaintiffs, into a claim for negligence. The plaintiffs may not maintain such a claim where they have alleged a breach of contract claim based on the same fundamental facts, transactions, and representations. The defendant's motion for summary judgment on this claim is granted.

## CONCLUSION

For the reasons explained above, the defendant's motion for summary judgment is granted. In addition, the plaintiffs' motion to strike is denied as moot. The Clerk is directed to enter Judgment dismissing the Amended Complaint with prejudice and closing this case.

**SO ORDERED.**