960 So.2d 773 (2007)
BANKERS TRUST COMPANY, etc., et al., Appellants/Cross-Appellees,
v.
Richard BASCIANO, Appellee/Cross-Appellant.
No. 5D05-2565.
District Court of Appeal of Florida, Fifth District.
May 25, 2007.
Rehearing Denied July 12, 2007.
*774 Kimberly A. Ashby, of Akerman Senterfitt, Orlando, and Phillip D. Parrish, of Phillip D. Parrish, P.A., Miami, for Appellants/Cross-Appellees.
David H. Simmons and Kenneth P. Hazouri, of de Beaubien, Knight, Simmons, Mantzaris & Neal, LLP, Orlando, for Appellee/Cross-Appellant.
ORFINGER, J.
Bankers Trust Company and Lennar Partners, Inc. (collectively, "Appellants") appeal a final judgment entered following a jury trial, finding Lennar liable for negligent misrepresentation and both Bankers Trust and Lennar liable for violating Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"), section 501.201-.213, Florida Statutes (1999). Based on the verdict, Appellants were ordered to pay $1.6 million to Richard Basciano. On appeal, Appellants contend that the trial court erred in failing to grant their motions for summary judgment, judgment notwithstanding the verdict ("JNOV"), directed verdict, and new trial. Mr. Basciano cross-appeals the trial court's summary judgment in favor of Appellants on his claims for breach of contract and promissory estoppel, and the trial court's remittitur order on his negligent misrepresentation claim. As explained below, we affirm in part, reverse in part and remand with directions that judgment be entered in favor of Appellants.
In 1998, 3835 McCoy Road Orlando Hotel, LC ("3835") obtained an $11.2 million non-recourse mortgage loan from Credit Suisse First Boston to fund the acquisition *775 and renovation of an Orlando-area hotel. Subsequently, Credit Suisse assigned the note, mortgage, loan documents and collateral to Bankers Trust. Soon thereafter, the loan went into default, and Bankers Trust retained Lennar to act as its "special servicer" to receive and control payments made on the loan, monitor loan covenants and defaults, and to explore a restructuring or a workout of the loan.
Lennar, on behalf of Bankers Trust, contacted 3835 and agreed to discuss the possibility of restructuring the loan with 3835's representatives. However, as a condition precedent to any loan restructuring discussions, two virtually identical pre-negotiation agreements were executed, which provided, among other things, that Appellants were making no commitments to a workout agreement, that any representations not in writing were of no effect, and providing a mutual waiver and release of any claims arising out of the restructuring discussions. The agreements, which were addressed to Mr. Basciano, referred to 3835 as the "Borrower" and were signed on behalf of 3835 by Mr. Basciano, as "Managing Member" and "President-PRA at McCoy Road, Inc., Sole Managing Member." More specifically, the pre-negotiation agreements provided:
Lennar Partners, Inc. (the "Special Servicer") is the Special Servicer with respect to the Loan and has the authority, on behalf of [Bankers Trust], to meet with representatives of the Borrower to review and discuss the Loan and any issues arising under any of the documents relating to the Loan (the "Loan Documents").
We have agreed to discuss with your representatives the status of the Loan and the Loan Documents provided that the following agreements and understandings govern.
1. Negotiations. The Borrower and the Special Servicer agree that any discussions, negotiations, correspondence or other communications relating to the Loan and the Loan Documents that the Borrower may have in the future or may have had since June 29, 1998 with representatives of [Bankers Trust] . . . or the Special Servicer, (any such discussions, negotiations or correspondence or other communications being hereinafter referred to as ("Loan Communications") are not binding upon the Borrower, [Bankers Trust] . . . (collectively the "Parties"). None of the Parties is under any obligation to consent or otherwise agree to any request with respect to the Loan, to modify the Loan or the Loan documents or to fulfill in any manner any discussions or agreements which may be or have been purported to be agreed upon between the Parties without the express written agreement of Borrower and the Special Servicer. The Parties further understand and agree that none of the Parties shall have any defense to any action brought by any other Party on behalf of the Custodian. Nor shall any Party assert any waiver based on any Loan Communications.
2. Releases. The Parties hereby completely, irrevocably and unconditionally release and forever discharge all other Parties of and from any and all claims and demands whatsoever, in law or equity, whether such claims are presently known or unknown, direct or indirect, fixed or contingent, which Borrower or the Special Servicer may have or may claim to have against the other Parties caused by, or arising out of any Loan Communications.
3. No Waivers. Borrower and Special Servicer acknowledge and agree that participation in the Loan Communications *776 does not constitute by any party (a) a renewal, extension or standstill arrangement as to the exercise of any rights, remedies or powers, (b) a waiver or release of any defaults under the Loan or the Loan Documents, or (c) a waiver, release or modification of any right or remedy or Loan Document provision. None of the Parties intend to waive any defaults that may exist, or any right or remedies unless and until it expressly does so in writing. Furthermore, participation in the Loan Communications shall not prevent any Party from exercising any right, remedy or power available to such Party including, without limitation, all rights, remedies and powers granted under the Loan Documents or at law or in equity. The Parties understand that any delay in exercising any right or remedy with respect to any collateral for the Loans while the Loan Communications continue shall not be the basis for any claim or cause of action.
4. Only Written Agreements. Borrower acknowledges and agrees that any conduct or statements, whether written, oral, telephonic or otherwise, made at any time in connection with the Loan Communications are without prejudice and, without exception, constitute settlement negotiations that are not to be disclosed to any other person nor be admissible as evidence in any administrative or judicial proceeding (i) between [Bankers Trust], Borrower and/or Special Servicer, or (ii) involving any of the Loan Documents or any of the property securing the Loans without prior written consent of the other Party. The Loan Communications, or any writings generated as a result of the Loan Communications, may not be sued in any litigation to indicate culpability, weakness of position or an admission of liability, or to otherwise admit any obligations due and owing to or from the parties.
5. Authority. The Borrower represents and warrants that the Borrower is the borrower under the Loan Documents, and the person signing this Agreement on behalf of Borrower hereby represents and warrants that Borrower has the necessary power and authority to execute and deliver this Agreement on behalf of the Borrower. This Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective successors, legal representative and assigns as applicable.
Notwithstanding the pre-negotiation agreements, after the parties were unable to reach a workout agreement, Mr. Basciano sued Appellants, claiming that Appellants had induced him to personally fund the hotel's shortfalls while the workout discussions were ongoing. He asserted that he was not bound by the pre-negotiation agreements as they were executed only by the borrowing entity, 3835, and not by him personally. Appellants responded by contending that Mr. Basciano has no viable claim against them since no binding agreement was ever reached, and that the pre-negotiation agreements and releases were binding on both 3835 and Mr. Basciano, as 3835's representative.
In his second amended complaint, Mr. Basciano asserted claims for breach of fiduciary duty, common law fraud, constructive fraud, negligent misrepresentation, unjust enrichment, promissory estoppel, violations of FDUTPA, and breach of an oral contract. Prior to trial, Appellants moved for summary judgment, which the trial court granted in part. In its order on summary judgment, the trial court ruled:

*777 First, the Court finds that there are genuine issues of material fact regarding whether Basciano was a legal representative under the Release, and therefore whether the letter agreements apply to him.
Second, the Court finds that the alleged agreement does not constitute an enforceable contract, as there is no evidence of an agreement on essential terms to the contract. . . . Because there is no evidence of an agreement as to essential terms, summary judgment is granted as to Count VIII in the Second Amended Complaint for breach of oral contract.
In addition, because the alleged agreement is too vague to be enforced, Basciano cannot rely on promissory estoppel, and summary judgment is granted as to Count VI, for promissory estoppel, also. . . .
Only the breach of oral contract claim and the promissory estoppel claim fall victim to the indefiniteness of the promise. According to the Second Amended Complaint, the other claims (breach of fiduciary duty, fraud, constructive fraud, negligent misrepresentation, and violation of the Florida Deceptive and Unfair Trade Practices Act) rely not only on the promise to restructure the loan, but also on Defendants' alleged failure to turn the appraisal over to Basciano in a timely manner. Since these claims rely on facts other than a promise to restructure the loan, they survive the motion for summary judgment.
Finally, the Court finds that there was no fiduciary relationship between the parties, and therefore summary judgment is warranted as to the claim for breach of fiduciary duty.
Thus, the remaining issues to be tried related to Basciano's claims for fraud, constructive fraud, negligent misrepresentation, and violation of the Florida Deceptive and Unfair Trade Practices Act, and damages.
Ultimately, the jury found in favor of Mr. Basciano and against Lennar on his claim of negligent misrepresentation and in favor of Mr. Basciano and against Lennar and Bankers Trust on the FDUTPA claim.
On appeal, Appellants' primary argument is that Mr. Basciano is precluded from asserting claims of negligent misrepresentation and FDUTPA violations based on the August 1999 discussions with Lennar because, at best, the result of those discussions was an agreement to agree in the future. Appellants contend that such an understanding creates no enforceable contract and that the same conduct and representations cannot form the basis for Mr. Basciano's other claims as they are merely derivative of an otherwise unenforceable agreement. We agree.
As the trial court correctly recognized in its summary judgment, the creation of a contract requires that there be mutual assent to a certain and definite proposition. "Where essential terms of an agreement remain open, and subject to future negotiation, there can be no enforceable contract." Dows v. Nike, Inc., 846 So.2d 595, 602 (Fla. 4th DCA 2003). What is an essential term of a contract will vary widely according to the nature and complexity of each transaction and must be evaluated on a case specific basis. King v. Bray, 867 So.2d 1224, 1228 (Fla. 5th DCA 2004).
Accepting the allegations in Mr. Basciano's second amended complaint as true, "Lennar promised to work cooperatively with Basciano to restructure the loan in a manner consistent with the appraisal's valuation of the hotel in order to give the hotel a reasonable chance of succeeding as *778 a going concern."[1] That agreement is, in our opinion, far short of an enforceable contract. Consequently, we agree that the trial court properly entered summary judgment in favor of Appellants on Mr. Basciano's contract claims.
We further conclude that the trial court erred when it failed to grant summary judgment or JNOV on Mr. Basciano's negligent misrepresentation and FDUTPA claims as those claims were premised on the same conduct and representations that were insufficient to form a contract and are merely derivative of the unsuccessful contract claim. See Mark Andrew of Palm Beaches Ltd. v. GMAC Commercial Mortgage Corp., 265 F.Supp.2d 366, 382 (S.D.N.Y. 2003) (holding that under Florida law, when statute of frauds prohibited plaintiff from enforcing an oral contract, claims for fraud and negligent misrepresentation seeking damages based on same conduct and representations are merely derivative of claim for breach of contract and are prohibited); see also Conner, I, Inc. v. Walt Disney Co., 827 So.2d 318 (Fla. 5th DCA 2002) (dismissing negligent misrepresentation claim where oral contract was unenforceable). To hold otherwise would allow every failed breach of contract claim to morph into a negligent misrepresentation or FDUTPA claim. The well-established laws governing contracts should not be so casually dismissed.
As to the claim of negligent misrepresentation, Mr. Basciano was required to plead and prove that he justifiably or reasonably relied on the alleged misrepresentation. See Johnson v. Davis, 480 So.2d 625, 627 (Fla. 1985). To state a cause of action for misrepresentation, there must be a right to rely. Butts v. Dragstrem, 349 So.2d 1205, 1206-07 (Fla. 1st DCA 1977). "Clearly, one is not justified in relying upon some action which the other party is not required to perform." Bruce v. Am. Dev. Corp., 408 So.2d 857, 858 (Fla. 3d DCA 1982). A party cannot rely to his detriment on an unenforceable promise. See J Square Enters. v. Regner, 734 So.2d 565, 566 (Fla. 5th DCA 1999) (citing Canell v. Arcola Housing Corp., 65 So.2d 849 (Fla. 1953)). Because Appellants' alleged promise to restructure the loan was unenforceable, Mr. Basciano had no right to rely on it and the negligent misrepresentation claim must fail.
Mr. Basciano's FDUTPA claim must fail as well. FDUTPA does not apply to banks and savings and loan associations regulated by the state or the federal government. See § 501.212(4), Fla. Stat. (2004). While recognizing that exemption, Mr. Basciano contends that Lennar is not *779 a bank protected by section 501.212(4), and, thus, falls within FDUTPA's scope. We agree that if Mr. Basciano had a viable FDUTPA claim, Lennar could be sued. Nothing in FDUTPA suggests that bank subsidiaries, affiliates or agents are necessarily exempt from FDUTPA. See State, Office of Attorney Gen., Dep't of Legal Affairs v. Commerce Commercial Leasing, LLC, 946 So.2d 1253, 1257-58 (Fla. 1st DCA 2007); Fed. Trade Comm'n v. Am. Standard Credit Sys., Inc., 874 F.Supp. 1080 (C.D.Cal. 1994) (holding that statutory exemption of banks from Federal Trade Commission's jurisdiction to prevent unfair or deceptive trade practices did not extend to banks' agents if agents were not subject to extensive federal administrative controls that had been imposed on banks).
However, Mr. Basciano's contention that despite the clear FDUTPA exemption, Bankers Trust, a regulated bank, can be held vicariously liable under FDUTPA for Lennar's action is misplaced. FDUTPA clearly excludes banks from its grasp. When a statute is free from ambiguity, we follow its plain meaning. A clear and unambiguous statute that conveys a clear and definite meaning causes no reason to resort to the rules of statutory interpretation; we must simply give the statute its plain and obvious meaning. Clines v. State, 912 So.2d 550, 555-56 (Fla. 2005). Here, the statute unambiguously excludes banks. There is nothing in the statute to suggest that a bank comes within the ambit of FDUTPA when its liability is purely vicarious. To hold otherwise would lead to an illogical result. Accepting Mr. Basciano's theory, a bank acting directly would be exempt from FDUTPA liability. However, if the same act was done by a bank agent, the bank could be vicariously liable under FDUTPA. We do not believe this is a result intended by the Legislature.
Finally, we address briefly the trial court's exclusion of two letters written in March 2000 to Lennar by Mr. Basciano. Mr. Basciano maintained that the pre-negotiation agreements were binding only on 3835, and not on him individually, as 3835's representative. Lennar attempted to impeach Mr. Basciano with the March 2000 letters in an effort to show that Mr. Basciano represented himself to Lennar as the representative of 3835; described himself in the letters as "me, the borrower;" and indicated a willingness to "turn over the keys" to the hotel if a workout agreement wasn't reached.[2] The trial court sustained Mr. Basciano's objection to the introduction of the March letters, concluding that they were settlement proposals, excludable under section 90.408, Florida Statutes (1999). That statute provides:
Evidence of an offer to compromise a claim which was disputed as to validity or amount, as well as any relevant conduct or statements made in negotiations concerning a compromise, is inadmissible to prove liability or absence of liability for the claim or its value.
Exclusion of the March letters was error. This was a non-recourse loan, making only 3835 liable. There was no dispute between Mr. Basciano and Appellants as to the validity of the debt or the *780 amount in controversy. If there is no dispute as to validity or amount, the section 90.408 prohibition does not apply because there is nothing to compromise; any statements made by a party would be admissible if relevant. Charles W. Ehrhardt, Florida Evidence § 408.1 (2006 ed.). Further, section 90.408 only excludes evidence offered to prove "liability or absence of liability for the claim or its value." § 90.408, Fla. Stat. (1999). If the evidence is offered for another purpose, the evidence is not barred by section 90.408 and will be admissible if it is relevant to prove a material fact or issue, subject to section 90.403, Florida Statutes (1999). Wolowitz v. Thoroughbred Motors, Inc., 765 So.2d 920, 925 (Fla. 2d DCA 2000).
The March 2000 letters were crucial to Lennar's argument that Mr. Basciano was acting not individually, but as the representative of the borrower throughout the process of negotiating a workout of the loan. As such, the exclusion of this evidence was an abuse of discretion and reversible error. However, because we conclude that no viable negligent misrepresentation or FDUTPA claims can be asserted against Appellants, the error was harmless.[3]
For these reasons, we affirm the judgment in part, reverse the finding of liability against Appellants for negligent misrepresentation and FDUTPA violations and remand with directions that judgment be entered in favor of Appellants.
AFFIRMED in part; REVERSED in part; REMANDED.
THOMPSON, J., concurs.
TORPY, J., concurs and concurs specially, with opinion.
TORPY, J., concurs and specially concurs.
I concur in the opinion of the majority and offer some additional explanation for my decision to concur in the reversal of the judgment awarded to Appellee, Mr. Basciano.
The critical issue here is whether Mr. Basciano had any individual claims against the bank. Because the limited liability company was not a party plaintiff, only the individual claims of Mr. Basciano are at issue here. In my view, there was no competent, substantial evidence to support any theory of liability in favor of Mr. Basciano in his individual capacity. Therefore, the lower court should have granted summary judgment or directed verdict on all of Mr. Basciano's claims.
When the loan went into default, Mr. Basciano, expressly acting only in a representative capacity on behalf of the limited liability company, signed the so-called pre-negotiation agreements. These agreements were intended to foster a dialogue regarding a resolution of the default without imposing any potential liability on the bank. This is a common arrangement in the commercial world without which a borrower in default would have no opportunity to negotiate because a lender would *781 fear that its discussions might be misconstrued or misstated. It is like settlement negotiations in any civil controversy. In fact, these agreements, among other things, expressly acknowledged that the contemplated communications would "without prejudice and, without exception, constitute settlement negotiations that are not to be disclosed to any person nor be admissible as evidence in any administrative or judicial proceeding. . . ." The clear intent was to prevent the borrower from asserting any claims against the bank arising from the negotiations unless the claims were based upon a written agreement signed by the bank.
To maintain his claims against the bank, Mr. Basciano necessarily attempted to circumvent the express terms of these agreements by claiming that he was not wearing his managing partner hat when he had the conversations with the bank's representatives. Instead, he claimed that the purported oral contract was made while he was wearing his individual hat, a contention that has no basis in the undisputed evidence.
Clearly, Mr. Basciano signed the workout agreement in his representative capacity, and the substance of all communications between him and the bank related directly to the resolution of the default between the bank and the limited liability company. As the majority points out, even under Mr. Basciano's version of the purported agreement, he was acting in his representative capacity because, as he said, if no agreement could be reached, he would "give. . . . the [hotel] keys back" and allow the bank to retake possession of the property. Mr. Basciano could not have made this agreement in his individual capacity because he had no personal right to surrender the premises.
The conclusion that Mr. Basciano was engaged in these communications on behalf of the limited liability company is further buttressed by the March 2000 letters erroneously excluded from evidence. In those letters, Mr. Basciano outlined the communications between the parties that had occurred since execution of the pre-negotiation agreements. He urged the bank to reduce the indebtedness amount and threatened protracted litigation with the bank if it did not agree. Like the pre-negotiation agreements, he signed the letters in his representative capacity as managing member of the limited liability company. As counsel for Appellants argued, the pre-negotiation agreements were the "alpha," and the post-negotiation letters were the "omega," clearly evidencing that all the negotiations in between involved the parties identified in the writings.
Contrary to the assertion of Mr. Basciano, nothing in his testimony supports a contrary conclusion. In response to counsel's question, the testimony was as follows:
Q. Okay. Was this, Mr. Basciano, a deal between you personally and Lennar?
A. Yes.
This testimony did not constitute substantial, competent evidence of a personal agreement between Mr. Basciano and the bank. It is simply Mr. Basciano's subjective conclusion and is completely unsupported by any testimony of communications between him and the bank on this topic.
For these reasons, and the reasons stated by the majority in its opinion, I conclude that Mr. Basciano simply did not have the right to sue this bank to redress these grievances under any legal theory.
NOTES
[1] On direct examination during trial, Mr. Basciano provided the following testimony regarding his understanding of his agreement with Appellants:

Q. And would you tell the jury what the agreement was that you and Mr. Brown [Lennar's representative] reached in the first part of September 1999.
A. Mr. Brown realized as special servicer that there was a problem here and definitely said, we will work it out if you will pay for the appraisal, keep making renovations, knowing full-well however that in spite of keeping the debt service current that the hotel was losing a substantial amount of money.
And I said, fine, let's do this expeditiously. And when I made that commitment to him I thought that [sic] would be a two or three week period before we would get the information regarding the true appraisal and then we would sit down and discuss me either buying it near the appraisal price, and I agreed that if the appraisal price did not make monetary sense to me, as a businessman and a man of my word, which I pride, I said, I will give you the keys back, you know, I could not fund it anymore and you can take the hotel over.
(Emphasis added).
[2] Additionally, Mr. Basciano testified as follows:

Q. And if you couldn't reach an agreement with Mr. Brown you told him you would give him the keys back?
A. Yes.
Q. And that means you would turn the property over?
A. Yes, if they acted in good faith.
Q. And you could offer the keys back because you owned the property, you were the owner, you were the legal representative of the borrower?
A. Yes. And your question, counsel?
(Emphasis added).
[3] We need not concern ourselves with the application of the bank statute of frauds, section 687.0304, Florida Statutes (1999), due to our conclusion that no enforceable contract existed. "[B]efore it becomes proper or necessary to determine whether the facts permit the enforcement of . . . a contract, as an exception under the Statute of Frauds, it must first be determined that the existence of the contract and the terms thereof have been established with both the quantum and the quality of evidence required under the applicable rules of law." Gable v. Miller, 104 So.2d 358, 360 (Fla. 1958). Because we conclude there was no contract formed, it is not necessary to determine if the bank statute of frauds would preclude its enforcement.